**CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Plaintiff,**

v.

**BELLMONT TRUCKING CO., INC., Defendant.**

Civ. No. F 84–375.

United States District Court, N.D. Indiana, Fort Wayne Division.

June 12, 1985.

Frederick W. Dennerline, III, Fillenwarth, Dennerline, Groth & Baird, Indianapolis, Ind., Stephen J. Lerch, Levine & Lerch, Fort Wayne, Ind., for plaintiff.

Steven L. Jackson, Parrish, Knight, Jackson & Beal, Fort Wayne, Ind., for defendant.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on summary judgment motions filed by both parties, and a cross-motion for summary judgment filed by defendant ("Bellmont"). At issue is whether Bellmont owes plaintiff (the "Fund") withdrawal liability under the provisions of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA" or "the Act"). For the following reasons, Bellmont's motion and cross-motion for summary judgment will be denied, the Fund's motion for summary judgment will be granted, and the Fund will be granted summary judgment on the withdrawal liability claim.

This cause arises out of the business misfortunes of Bellmont. Bellmont was involved in the trucking business. Its driv-

ers were members of Teamsters Local No. 414, and Bellmont itself was a signatory to the National Master Freight Agreement ("NMFA") by virtue of its membership in the Indiana Motor Carriers Labor Relations Association. The NMFA requires that employers like Bellmont make contributions to the Fund in order to help fund the pension benefits of their employees.

In the late 1970s, International Harvester ceased production at its Fort Wayne facility, which significantly affected Bellmont's business. Deregulation of the trucking industry took its toll as well. By 1983, Bellmont had only five Teamster-represented employees.

The union local struck Bellmont over wages on May 23, 1983, and Bellmont filed a Chapter 11 bankruptcy on June 15, 1983. At the time of the bankruptcy filing, Bellmont ceased to have an obligation to continue making payments to the Fund, and the Fund's trustees determined that Bellmont had withdrawn from the Fund as defined under MPPAA, so that Bellmont had incurred withdrawal liability under the Act. The Fund therefore filed a claim in the bankruptcy for the amount of the liability, the claim being for $115,098.66.[1] This court removed the proceeding concerning the withdrawal liability issue from the bankruptcy court on January 15, 1985, and these motions for summary judgment followed.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment serves as a vehicle with which the court "can determine whether further exploration of the facts is necessary." *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975).

In making this determination, the court must keep in mind that the entry of summary judgment terminates the litigation, or an aspect thereof, and must draw all inferences from the established or asserted facts in favor of the non-moving party. *Peoples Outfitting Co. v. General Electric Credit Corp.,* 549 F.2d 42 (7th Cir. 1977). The non-moving party's reasonable allegations are to be accepted as true for purposes of summary judgment. *Yorger v. Pittsburgh Corning Corp.,* 733 F.2d 1215, 1218–19 (7th Cir.1984). A party may not rest on the mere allegations of the pleadings or the bare contention that an issue of fact exists. *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 392 (1983). *See Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See also Atchison, Topeka & Santa Fe Railway Co. v. United Transportation Union,* 734 F.2d 317 (7th Cir.1984); *Korf v. Ball State University,* 726 F.2d 1222 (7th Cir.1983). *See generally* C. Wright, *Law of Federal Courts,* § 99 (4th ed. 1983); 6 *Moore's Federal Practice,* § 56.15 (2d ed. 1984).

Thus, the moving party must demonstrate the absence of a genuine issue of material fact. The court views all evidence submitted in favor of the non-moving party. Even if there are some disputed facts, where the undisputed facts are the material facts involved and those facts show one party is entitled to judgment as a matter of law, summary judgment is appropriate. *Egger v. Phillips,* 710 F.2d 292, 296–97 (7th Cir.1983); *Collins v. American Optometric Assn.,* 693 F.2d 636, 639 (7th

---

1. Bellmont, in its response to the verified motion for removal of this dispute from the bankruptcy court to this court, admits that "if it has liability to the Fund, that said liability is in the approximate amount of One Hundred Ten Thousand, One Hundred Twenty two dollars and Eighty Cents ($110,122.80)." The $4,975.86 difference between Bellmont's and the Fund's figure is the amount of the Fund's claim which is alleged to be the amount of past contributions owing and due.

**1508**

Cir.1982). Further, if the court resolves all factual disputes in favor of the non-moving party and still finds summary judgment in favor of the moving party is correct as a matter of law, then the moving party is entitled to summary judgment in his favor. *Egger,* 710 F.2d at 297. *See also Bishop v. Wood,* 426 U.S. 341, 348, 348 n. 11, 96 S.Ct. 2074, 2079, 2079 n. 11, 48 L.Ed.2d 684 (1976).

The essence of the dispute in the Fund's motion and Bellmont's cross-motion for summary judgment is whether Bellmont is entitled to claim that it is not subject to withdrawal liability because of the "trucking industry exemption" of 29 U.S.C. § 1383(d). The dispute involved in Bellmont's motion for summary judgment is whether the fact that all of Bellmont's union employees are either retired or working for another Fund-member employer relieves Bellmont of withdrawal liability. However, both of these disputes must be understood in the context of the MPPAA, and the court begins by briefly examining this legislative background.

Perhaps the best summary of the legislative history of MPPAA is set forth in Judge Getzendanner's opinion in *Peick v. Pension Benefit Guaranty Corp.,* 539 F.Supp. 1025 (N.D.Ill.1982), *aff'd,* 724 F.2d 1247 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984). A brief recap will suffice here.

In 1974, the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.,* was enacted as comprehensive federal regulation of pension plans. Title IV of ERISA established a termination insurance program run by the Pension Benefit Guaranty Corporation ("PBGC"), and funded by employer's premium payments.

For multiemployer plans, such as the Fund here, ERISA granted PBGC discretion to determine on a case-by-case basis whether, when a multiemployer pension plan was about to terminate, the PBGC would pay the terminating plan's participants the difference between the value of their guaranteed benefits and the value of the plan's assets on the date of termination. 29 U.S.C. § 1381(c)(2) (1976 ed.). If PBGC funds were expended in meeting such shortfalls, all employers that contributed to a terminated multiemployer plan during the five years preceding termination were collectively liable for the amount disbursed. *Id.* at 1364. In effect, an employer that withdrew from an ongoing or non-terminating plan incurred a contingent liability: if the plan terminated within the next five years, the employer would be liable for its proportionate share of the amount PBGC might expend at the time of termination.

It became clear to Congress that PBGC "insurance" of a terminating plan's shortfall, and the possibility of avoiding liability by withdrawal more than five years before a plan's termination, created great incentives to withdraw from multiemployer plans. *See* H.R. No. 869, 96th Cong.2d Sess., 54–55, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2918, 2922–23. To combat this incentive, the MPPAA was passed.

One significant change wrought by MPPAA was the alteration of the liability for an employer's withdrawal from a multiemployer plan. Whereas ERISA gave an employer a contingent liability, MPPAA assigns a withdrawing employer immediate liability for a fixed and certain debt owed to the plan, 29 U.S.C. § 1381, which is known as "withdrawal liability:"

> If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.

29 U.S.C. § 1381(a). "Complete withdrawal" is defined in § 1383, while "partial withdrawal" is described in § 1385. The "plan sponsor," or trustees of the plan, are responsible for determining the amount of withdrawal liability under § 1391, notifying the employer of the amount of the liability,

and collecting it from the employer. 29 U.S.C. § 1382.

The issues here are simplified by the fact that Bellmont does not challenge the Fund's computation of Bellmont's withdrawal liability. The pending motions make clear that the dispute is whether Bellmont owes *any* withdrawal liability. Two rationales are offered to support Bellmont's argument: the applicability of the "trucking industry exemption," and the retirement or reemployment of all of Bellmont's employees. The court considers each of these in turn.

### Trucking Industry Exemption—29 U.S.C. § 1383(d)(2)

As noted earlier, an employer is immediately liable for withdrawal liability upon a "complete" or "partial" withdrawal from a multiemployer plan. 29 U.S.C. § 1381. Under the terms of § 1383(a), a complete withdrawal occurs when an employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." Section 1383 then presents special formulations for particular industries: the building and construction industry (§ 1383(b)); the entertainment industry (§ 1383(c)); and the trucking industry (§ 1383(d)).

The trucking industry exemption alters the § 1383(a) definition of complete withdrawal by mandating that a withdrawal occurs only if

(A) an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan, and

(B) either—

(i) the corporation [PBGC] determines that the plan has suffered substantial damage to its contribution base as a result of such cessation, or (ii) the employer fails to furnish a bond issued by a corporate surety that is an acceptable surety for purposes of section 1112 of this title, or an amount held in escrow by a bank or similar financial institution satisfactory to the plan, in an amount equal to 50 per cent of the withdrawal liability of the employer.

Section 1383(d)(3).[2] For the exemption to apply, the plan must be one in which

substantially all of the contributions required under the plan are made by employers primarily engaged in the long and short haul trucking industry, the household goods moving industry, or the public warehousing industry.

Section 1383(d)(2).

The dispute here centers on the meaning of the phrase "substantially all" in § 1383(d)(2). The Fund, in its motion for summary judgment, argues that the phrase means "at least 85%," while Bellmont's cross-motion for summary judgment postulates that the term means "a majority" or "more than half."

The issue is apparently one of first impression. Two courts have actually discussed the phrase, but only in the context of a constitutional challenge to the MPPAA as being "impermissibly vague." The *Peick* court spoke of one sponsor of the Act as indicating that the phrase meant "at least 85%" (*see* discussion *infra*). 539 F.Supp. at 1060. But the court also spoke

---

**2.** It is unclear from the present record whether either of the two conditions in § 1383(d)(3)(B) have been met. Part of the reason may be that both parties have been awaiting the court's determination on whether the trucking industry exception even applies here. Were the court to conclude that the exception applies, Bellmont would be able to post a bond, in order to have PBGC determine whether substantial damage would be done to the plan's contribution base

by Bellmont's withdrawal. (Given the fact that Bellmont had only five Teamster-employees, and the Fund has over 2.1 billion dollars in contributions from 1975–1979 (see copy of survey attached to the Affidavit of Thomas Frawley, Exhibit B to the Fund's Motion for Summary Judgment), there is a real possibility that PBGC would find no substantial damage to the Fund's contribution base by Bellmont's withdrawal.)

in terms of a "majority" definition: "Clearly, if less than 50 percent of the contributions to a plan come from employers in the covered industries, the exemption does not apply." *Id.* Both the Fund and Bellmont cite to these respective quotations as support for their positions. A second court interpreted *Peick* as pointing out that "the legislative history of the 1980 Act indicates that Congress intended the trucking industry exemption to apply to plans in which at least 85 percent of the contributors were employers contained in the trucking industry." *Republic Industries v. Teamsters Joint Council,* 718 F.2d 628, 643 n.19 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). However, both the *Peick* and *Republic Industries* courts were dealing with vagueness challenges to the MPPAA, and thus their statements about the actual meaning of the phrase are dicta. The court must therefore confront the actual definition of the phrase for the first time.

The legislative history behind the phrase is both conflicting and sparse. The parties here have identified what are apparently the only statements made about the phrase during the legislative debates. Representative Thompson, one of the House sponsors of the MPPAA, stated:

> The bill also contains a special withdrawal liability rule for certain trucking industry plans where substantially all of the contributions are made by employers primarily engaged in the long and short haul trucking industry, the household goods moving industry or the public warehousing industry. The phrase "substantially all" appears in several provisions of the tax laws—including the industrial development bond and the private foundation rules—where the Internal Revenue Service has interpreted the phrase to mean at least 85 percent. It is our intent that, as used in this special trucking industry withdrawal liability rule, the substantially all requirement would only be satisfied where at least 85

percent of the contributions to the plan are made by employers who are primarily engaged in the specified industries.

126 Cong.Rec. 23040 (1980). At the same time, however, Senator Durenberger noted:

> With specific reference to 4203(d)(1)(A) [the trucking industry exemption] it should be observed that if a majority of the contributions to any pension plan are made by employers engaged in the over the road (long) and short haul trucking industry, the household goods moving industry and the public warehousing industry, this withdrawal liability procedure will apply to all employers who contribute to such a plan.

125 Cong.Rec. 23286–87 (1980).

■ The usual rule of statutory construction is that when the plain language of a statute is clear, a court need look no further than those words in interpreting the statute. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976); *Estate of Cowser v. C.I.R.,* 736 F.2d 1168, 1171 (7th Cir.1984). Here, the language of the exemption is not clear with sufficient precision to allow a court to determine the exact percentage of contributions which equals "substantially all"; the differing interpretations of Representative Thompson and Senator Durenberger are evidence of that fact. Therefore, the court will follow the rule that "[u]nless there is persuasive reason to the contrary, words in statutes should be given their common meanings." *International Administrators, Inc. v. Life Ins. Co. of North America,* 753 F.2d 1373, 1379 (7th Cir. 1985); *Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1085 (7th Cir.1984).

In determining the "common meaning" of the phrase "substantially all," the court begins by noting that the key word is "substantially," for that term modifies "all." If Congress had said that "all" contributions to a plan must come from employers primarily engaged in the trucking industry, it would be easy to determine the percentage required: 100%. The uncertainty here is

created by the modifier, as it necessarily reduces the percentage to some amount less than 100%. The question is how much less.

In an attempt to ascertain the common meaning of the term "substantially," the court consulted several dictionaries. Many define the term as meaning "of ample or considerable amount, size, or quantity," *see e.g.*, *Random House Dictionary of the English Language*, p. 1418. *Webster's Third New International Dictionary*, p. 2280, defines "substantially" as "being that specified to a large degree or in the main." *Webster's* goes on to list "massive" as the synonym of "substantially." These definitions indicate that the common meaning of the phrase "substantially all" must be something which indicates "a large degree" or "large amount" of all; the terms "almost all" or "nearly all," though admittedly imprecise, capture the essence of the phrase. If "substantially" is synonymous with "massive," then "substantially all" must mean some percentage which is very near 100%.

■ This analysis militates against Bellmont's (and Senator Durenberger's) definition of "substantially all" as a simple majority. Under a majority definition, fifty-one percent (51%) would be a majority, and yet could not be considered "almost all" or "a large degree or amount" of all; common sense dictates that an amount barely over one-half of the total is no where near the total amount. Without entangling itself in the task of precise definition with imprecise words, the court concludes that the defini-

tion of "substantially all" as a majority must be rejected because it does not comport with the common meaning of the term as implied in the definitional analysis above.

The court's task is to find some percentage of employer contributions which is consistent with the common meaning of "substantially all." As noted before, that percentage must be very near 100%; for that reason, more than 50% is too imprecise and must be rejected. While many different figures may constitute percentages very near 100%, the statements of Representative Thompson now assume added significance. Those statements are directly on point; they assign an exact percentage to the statutory terminology at issue here. The 85% figure described by Representative Thompson is a percentage very near 100%—it would clearly be a "large amount" of "all" of the contributions. The 85% figure therefore comports with the common meaning of "substantially all." Because the percentage figure was offered by a sponsor of MPPAA as a statement of intent as to the meaning of the term, it is entitled to some weight as legislative intent.[3] The court is persuaded that the 85% figure, which is consistent with the common meaning of the phrase and which comes from a person intimately involved in the passage of the Act, is the proper percentage figure to attach to the "substantially all" language of the trucking industry exemption.[4] As Representative Thompson pointed out, the fact that the Internal Revenue Service has interpreted the same phrase to mean 85% adds support to this

**3.** It is clear that "[t]he remarks of a single legislator, even a sponsor or conferee, do not control the analysis of legislative history." *Monterey Coal Co. v. Federal Mine Safety and Health Review Commission*, 743 F.2d 589, 596 (7th Cir. 1984). Senator Durenberger's conflicting comments also suggest caution in assigning weight to Representative Thompson's comments. However, Senator Durenberger's statement can be discounted because it does not comport with the common meaning of the phrase. Thompson's statement, on the other hand, has appeal because of its consistency with the common

meaning. It is this consistency, and the paucity of any other legislative intent, which entitles Representative Thompson's statement to weight as an expression of the legislature's intent to have the statute's language comport with its common meaning.

**4.** In this regard, the *Peick* and *Republic Industries* cases offer some additional support for the court's conclusion, even though the statements about the 85% figure were made in *dicta*.

conclusion. Thus, in order for the exemption to apply, at least 85% of the contributions to the plan must come from employers primarily engaged in the long and short haul trucking industry, the household goods moving industry, or the warehousing industry.

■ The factual issue here is whether at least 85% of the contributions to the Fund come from the trucking industry. The only facts pertaining to this issue alleged in this case are contained in a staff report of the Fund which is attached as an exhibit to the affidavit of Thomas E. Frawley, Exhibit B to the Fund's Memorandum in support of its motion for summary judgment. The staff report details the results of a computer survey of employer records designed to determine what percentage of the Fund's contributions come from firms engaged in the industries listed in the exemption. The survey was designed to look for "key words" in the employer's names which would indicate whether the employer was in the trucking industry. The survey produced three groups of employers: Trucking Industry; Non-Trucking Industry; and Unknown Industry. The total gross contributions during the years 1975–1979 were: Trucking Industry, 60.42%; Non-Trucking Industry, 32.58%; and Unknown Industry, 7.00%.

Admittedly, the survey has some flaws.[5] Yet the facts of this case suggest that the survey is entitled to weight for purposes of determining the percentage of contributions to the Fund from the trucking industry. First, the methodology of the survey, although based on key words in the employers' names, involved two phases of manual checking of names to catch employers that the Fund knew were or were not

trucking industry companies despite their names. This suggests that the numbers are fairly accurate. Second, there have been no other facts presented in the case on this issue. In fact, Bellmont argued that it would be burdened by having to sift through the Fund's records to determine the percentages of contributions, and thus argued that the Fund should prove the issue. Defendant's Memorandum on the Issue of Burden of Proof, p. 5. The Fund produced the survey, and Bellmont has not rebutted it. Third, Bellmont has attempted to use the survey results to support its claim that the exemption applies under the definition of "substantially all" as a "majority." Memorandum in Opposition to Fund's Motion for Summary Judgment, p. 3. Finally, the parties both agreed at a status conference held June 6, 1985 that the survey's percentages were to be the operative figures for deciding the Fund's motion and Bellmont's cross-motion.[6] Under the principles for summary judgment, the court accepts the survey findings as uncontested facts.

Given the survey finding that 60.42% of the contributions to the Fund come from the trucking industry, it is clear that the trucking industry exemption does not apply here because substantially all (i.e., at least 85%) of the contributions do not come from employers primarily engaged in the industries listed in § 1383(d)(2). Therefore, the court will grant the Fund's motion for summary judgment and deny Bellmont's cross-motion.

### Bellmont's Withdrawal Liability in Light of the Retirement or Reemployment of its Employees

Bellmont's motion for summary judgment is premised on the argument that,

---

5. The Fund itself admits that "[t]he Fund's position at all times has been only that the survey was informed, incomplete, not based on the current definition of the term "employer" as used by the Pension Benefit Guaranty Corporation, and therefore not definitive." Response to Defendant's Memorandum on Issue of Burden of Proof, p. 6. Furthermore, a search which is based only on the names of the employers may allow some trucking companies to not be picked up during the search.

6. The Fund contends that the contribution percentage is much less than 60% because the current definition of "employer" under ERISA would call for looking at parent companies in lieu of subsidiaries which are trucking companies. Without deciding the issue, the court will use the 60% figure of the study for purposes of these motions because counsel for the Fund agreed to its use.

even if the trucking industry exemption does not apply, Bellmont is excused from having to pay withdrawal liability because its employees have either retired or been reemployed by other firms which contribute to the Fund. Because the Collective Bargaining Agreement mandated that the employer make contributions only if the employee worked during the week, Bellmont argues that retirement means no further contributions need be made for the retirees, and the fact that the rehired employee's contributions are being made by their new employers, leaves nothing left for Bellmont to pay.

■ Bellmont misconceives the purpose behind withdrawal liability. The imposition of withdrawal liability is not done to assure *contributions;* rather, withdrawal liability is designed "to protect the benefit security of participants in multiemployer pension plans." *Washington Star Co. v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1505 (D.C. Cir.1984). Thus, the statutory computation methods look to the benefits which have already vested for employees, 29 U.S.C. §§ 1381, 1391. The Supreme Court describes withdrawal liability as "the employer's share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *PBGC v. R.A. Gray & Co.,* —— U.S. ——, 104 S.Ct. 2709, 2715, 81 L.Ed.2d 601 (1984). The Fund here has determined, and Bellmont has not contested, that the amount of the "unfunded vested benefits" which can be allocated to Bellmont totals $110,122.80.

■ The error of Bellmont's reasoning is perhaps founded on a misconception of Bellmont's responsibility to the Fund as a contributing employer. Bellmont's contributions do more than simply benefit Bellmont employees; the funds are turned over to the Fund, which will later pay benefits to the employees. The Fund does not collect the Bellmont contributions and keep them in a separate bank account for later disbursal to Bellmont employees only. Rather, it combines the contributions of many employers and pays benefits out of the pool of funds contributed. The whole purpose behind multiemployer pension plans is to pool resources to pay all participants their accrued benefits; withdrawal liability serves the purpose of protecting the pool and thus the "benefit security" of participants in the plan. *Washington Star Co.* Withdrawal liability is therefore more than an obligation to one's employees; it is an obligation to the Fund, the participants in it, and the other contributing employers.[7] While it may seem unfair that Bellmont should be socked with over $110,000.00 in withdrawal liability when its own employees may seem to be protected, the Fund is doing nothing more than enforcing the provisions of the MPPAA when it assesses withdrawal liability against Bellmont in the form of a bankruptcy claim. This court will not second-guess the legislative wisdom behind the statutory withdrawal liability scheme.

Bellmont cites two recent cases in support of its argument: *Dorn's Transportation and Oneida Motor Freight, Inc. v. Teamster Pension Trust Fund of Phila-*

---

7. Additional support for this view can be found in the legislative history of the Act. The House Education and Labor Committee Report, in discussing withdrawal liability, stated that "[t]he purpose is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan ... Employer withdrawal liability will help to insulate a plan from the adverse effects of a sustained decline in the contribution base." H.R. No. 869 (Part I), 96th Cong.2d Sess., 67, reprinted in 1980 U.S.Code Cong. & Ad.News 2918, 2935. The Committee later stated: "The purpose of these [withdrawal liability] provisions is to protect the

funding base of the plan so that remaining employers will not be forced to absorb additional cost increases. In the absence of these rules, the committee believes that employer withdrawals will lead to plan failures with unnecessary losses for participants and the PBGC." *Id.* at 73, 1980 U.S.Code Cong. & Ad.News at 2918, 2941. The report of the House Ways and Means Committee echoed these sentiments. H.R. 869 (Part II), 96th Cong.2d Sess., 15, 1980 U.S.Code Cong. & Ad.News 2918, 3004.

*delphia Vicinity*, No. 83–2102, slip op., (D.N.J. October 25, 1984); and *Dyck v. Southern Pacific Mining Co.*, 4 EPC 1346 (D.C.Cal.1983). The court finds neither of these cases persuasive. Both involved a transfer of the business to a different corporate entity; *Dorn* involved a sale to another company, while *Dyck* involved a transfer of facilities from one subsidiary to another of the same corporate parent. The sale of assets to an unrelated party activates the special exception of 29 U.S.C. § 1384, which provides that a complete or partial withdrawal does not occur solely because of an arm's length sale of assets if certain conditions are met. A transfer of assets between related subsidiaries, though § 1384 is not applicable, is nevertheless similar to a sale of assets. Both are calculated business ventures in which a transfer of employees from one plan contributor to a new plan contributor necessarily follows. Bellmont seeks to argue that the happenstance occurrence that some of its employees were rehired, so that contributions continued to be made to the Fund on their behalf, is analogous to *Dorn* and *Dyck*. The court finds no such analogy.[8] Congress could not have intended that the elaborate withdrawal liability structure of MPPAA could be thwarted by the chance events that employees happen to retire or find a job with another employer who happens to contribute to the same pension plan. Bellmont's motion for summary judgment will therefore be denied.

Bellmont has as much as admitted that it has withdrawn from the Fund by ceasing to have any obligations to contribute to the Fund because of its "closing," filing for bankruptcy, and the fact that it currently has no employees. Upon withdrawal, Bellmont was liable for its § 1381 withdrawal liability. Both parties admit that the amount of the liability is $110,122.80. There being no issue of material fact left in this case, the Fund is entitled to summary judgment in the amount of the withdrawal liability.

### Conclusion

For the foregoing reasons, Bellmont's motion for summary judgment and cross-motion for summary judgment are hereby DENIED. The Fund's motion for summary judgment on the trucking industry exemption issue is hereby GRANTED. The Fund is also GRANTED summary judgment on its claim for withdrawal liability in the amount of $110,122.80.

---

**8.** The House Ways and Means Committee, in discussing the definitions of withdrawal, stated: "A withdrawal does not occur, however, where an employer ceases to exist *merely by reason of a change in form or structure,* as long as the employer is replaced by a successor employer and there is no interruption in the successor employer's contributions to the plan or obligation to contribute under the plan." H.R. No. 869 (Part II), 96th Cong.2d Sess. 16, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2918, 3005 (emphasis added). This describes the situation in *Dorn* and *Dyck;* the employer sold or transferred the business to another employer, and the succession of contribution responsibility followed from the corporate change *as a matter of course.* Here, Bellmont ceased to exist as an employer because, for all intents and purposes, it went out of business by filing bankruptcy. The fact that Bellmont employees ended up at another employer did not follow as a matter of course from Bellmont's ceasing operations (except insofar as the employees, needing to find other work, looked elsewhere). The analogy to *Dorn* and *Dyck* fails because Bellmont's situation cannot be viewed as a normal business transaction-type change of employers for purposes of the Act. To hold otherwise, and find that a business bankruptcy is analogous to a mere change of corporation ownership, would seriously undermine the rationale behind withdrawal liability.