EASTERBROOK, Circuit Judge.
 

 Wis.Stat. § 815.18(6), which makes certain property unavailable to satisfy a civil judgment, allows the judgment debtor to exempt 8 cows, 10 pigs, 50 chickens, 2 horses or 2 mules, 10 sheep, one year’s feed for the livestock, and some farm equipment, including: “one wagon, cart or dray, one sleigh, one plow, one drag, one binder, one tractor not to exceed in value the sum of $1,500, one corn binder, one mower, one springtooth harrow, one disc harrow, one seeder, one hay loader, one corn planter,” and miscellaneous tools worth as much as $300. Debtors in federal bankruptcy cases sometimes may exempt the property that states protect from civil execution. See 11 U.S.C. § 522(b)(2)(A). They may use this exemption for “implements, professional books, or tools, of the trade of the debtor”, see § 522(f)(2)(B), even though they have given their creditors security interests in the items. In this bankruptcy case, where the parties have agreed that the debtor may keep as an “implement” or “tool of the trade” any asset mentioned in Wis.Stat. § 815.18(6), we must decide whether a baler is a “hay loader” and whether a haybine is a “mower”. (We need not and do not decide whether the agreement was provident.)
 

 A baler not only loads hay on a wagon but also ties it in bales; a haybine not only mows hay but also conditions it. Both the bankruptcy judge and the district judge concluded that the extra functions of the machines did not prevent their exemption under § 815.18(6). In an earlier case,
 
 *1092
 
 however, a different bankruptcy judge held that a baler with thrower is not a “binder”, a row corn picker a “corn binder”, or a bale elevator a “hay loader” for purposes of § 815.18(6).
 
 In re Flake,
 
 33 B.R. 275 (Bkr.W.D.Wis.1983). Dorchester State Bank, which had security interests in the baler (worth $400) and the haybine (worth $1,500), maintains on appeal that it is no more sensible to call a baler a “hay loader” or a haybine a “mower” than it is to call a row corn picker a “corn binder” or a snowmobile a “sleigh” within § 815.18(6). The district court’s order, 63 B.R. 632, leaves nothing else to do in this bankruptcy case, so the decision is “final” and appealable under 28 U.S.C. § 158(d). See also
 
 In re Jones,
 
 768 F.2d 923 (7th Cir.1985).
 

 The problem in this case comes from the fact that technology has done more to change farm implements than the Wisconsin legislature has done to change § 815.-18(6). The “mower” and “hay loader” were added to the list in 1935, and § 815.-18(6) has been unchanged (with an immaterial exception) since then. The statutory list comprises the equipment that in 1935 would have kept a small farm in operation. But small farms now use a different set of equipment. We concentrate on the hay-bine, because the same principles influence the treatment of both haybine and baler. The mower, which cuts hay, has been succeeded by the haybine (also called a “mower-conditioner”), which cuts and crushes hay in a single operation so that the hay dries faster. If the statute applies only to farm implements customary in 1935, and therefore omits the haybine, it does not achieve its purpose today; yet if the statute exempts all successors of the listed equipment, technological change may dramatically enlarge the exemption without legislative consideration. One need only think of the technological successor of the statutory “binder” — the self-propelled combine, which may be worth $1 million. Asked at oral argument if a combine would be exempt under § 815.18(6), Erickson’s counsel replied that it would. That cannot be right, yet neither is it appropriate to say that the statute covers only machines called “mowers”.
 

 This is so in part because language evolves. Janitors have become custodians; garbage collectors have become sanitary engineers; hearing examiners turned into administrative law judges; referees in bankruptcy are now bankruptcy judges; employees are terminated rather than fired, and spies are “terminated with extreme prejudice” rather than assassinated. The longer the time, the more the language changes. Hamlet says to Guildenstern in Act II, scene 2: “I am but mad north-northwest: when the wind is southerly I know a hawk from a handsaw.” He means that he is feigning madness, shown because he can tell one bird from another when he wants. (To Shakespeare, a “handsaw” was a heron — or so some scholars believe. We stand clear of the debate about what exactly this line means.) If § 815.18(6) said that a farmer may exempt “8 cows, 10 pigs, 50 chickens, 2 horses or 2 mules, 10 sheep, 1 hawk, and 1 handsaw”, that we now think of a handsaw as a tool would not subject the handsaw’s value to the $300 limit the statute places on “miscellaneous tools”.
 

 There is a more compelling reason, however, why “mower” is not limited to the thing called a mower today, or even the thing called a mower in 1935. A statutory word of description does not designate a particular item (e.g., “a Massey-Ferguson Mower, Model GY-2589, manufactured in 1935, serial number 3875808”) but a class of things that share some important feature. Which feature is important depends on the function of the designation and how it will be interpreted by the audience to whom the word is addressed. Cf. Saul Kripke,
 
 Wittgenstein on Rules and Private Language
 
 19, 28, 98-109 (1982). If someone at a dinner party says: “Pull up a chair to the table”, he means a table chair and not an overstuffed easy chair, even though both are called chairs. The word “chair” in an exemption statute, however, might include easy chairs but not Chippendale chairs — because the function of the statute is to leave the person a place to sit rather than to protect an antique valued (and valuable) for its beauty and age rather than its comfort. (There is a standing in
 
 *1093
 
 junction not to sit on Chippendale chairs because that might destroy their value.) And if a change in language or function should cause a new name to be applied to a place to sit — say, if reclining chairs with stereo speakers built in should come to be called “stereoloungers” — it would be necessary to examine the function of the denotation yet again rather than say that a “ster-eolounger” is not a “chair” and that is that.
 

 When asked at oral argument whether a mower with a built-in stereo cassette deck would still be a “mower”, the Bank’s lawyer answered yes, because it would still cut the hay. Yet it would have a second function, entertainment, just as the haybine has a second function, crushing the hay. The Bank’s counsel balked at this extension because the crushing function makes the hay-bine more valuable as'a farm implement and thus enlarges the shelter provided by the statutory exemption. Erickson’s hay-bine is worth $1,500, considerably more than a mower. (Erickson also actually owns an old mower, valued at $25.) Yet the tape deck, too, would increase the market value of the mower.
 

 There cannot be an “equal value” principle in § 815.18(6). The “mower” has changed through time. When brought to market in the mid-nineteenth century, the mower was a simple, horse-drawn successor to the reaper. See Michael Partridge,
 
 Farm Tools Through the Ages
 
 145-46 (1973). When in 1935 Wisconsin first created an exemption for a mower, many implements called “mowers” were horse drawn. Most mowers designed to be pulled by tractors drew power for the blades from the friction of wheel against ground. See Harris P. Smith & Lambert H. Wilkes,
 
 Farm Machinery and Equipment
 
 286-87 (6th ed. 1976). The tractor-mounted mower, which drew power direct from the drive shaft of the tractor, was not introduced until 1930. After 1935 mowers grew in size, complexity, and efficiency. In 1952 the pitman drive for the blades was replaced by pitmanless cams, which reduced vibration and increased operating speed.
 
 Id.
 
 at 289. Later machines, still called “mowers”, grew larger and more sophisticated; some had hydraulic lifts so that they could be maneuvered more accurately.
 
 Id.
 
 at 294-96. The “mower” that could be found on a farm in 1975 probably had no more parts in common with a horse-drawn 1935-vintage mower than a 1975 haybine had in common with a 1975 mower. The Bank does not deny that a mower made in 1975 would qualify as a “mower”, which dooms the argument that an increase in value eliminates the exemption.
 

 Changes in value also cut both ways. The exemption for a tractor is limited to $1,500, for example; in 1935 this might have exempted a small tractor, but now it does not. A true “equal value” principle would interpret “$1,500” as denoting real (inflation-adjusted) rather than nominal dollars, or perhaps it would adjust the exemption to, say, the percentage of the value of the debtor’s tractor that $1,500 would have represented in 1935. The Bank does not ask us to increase the value of the exemption for Erickson’s tractor; it is no more appropriate to ensure that the exemption for the “mower” is worth now what it was worth in 1935. A legislature can write an exemption with a dollar limit (as it did for tractors and tools) or without; when it chooses the latter course a court may not treat the statute as if it had the missing valuation rule. The exemption for a mower does not depend on value, just as an exemption for an “automobile” would not. A 1986 Audi 5000CS Turbo Quattro- and a 1976 Volkswagen Rabbit probably have less in common (and surely have a greater difference in value) than a 1975 mower and a 1975 haybine, yet both are cars; so too with farm equipment.
 

 This does not necessarily require a decision in Erickson’s favor. Our inability to apply either a “plain meaning” or “same value” approach does not identify with any confidence what a mower
 
 is,
 
 although it forecloses some ways of identifying what a mower is not. The bankruptcy and district judges concluded that a haybine is a “mower” because it is the “technological successor” to the mower. But the self-propelled combine is the technological successor to the binder, and if you allow enough leeway
 
 *1094
 
 the Boeing 747 is the technological successor of the chariot. The ability to trace a line of descent is not sufficient — not unless the scope of the statute is entirely liberated from its history and function. A statute designed to allow family farmers to keep the minimum equipment necessary to work the land cannot readily exempt a self-propelled combine, “technological successor” or not. (We needn’t consider the possibility that the self-propelled combine is the “successor” to the tractor and so is limited by the $1,500 maximum for tractors.) The role of an exemption in the statutory structure, not the march of technology, is the centerpiece in identifying the meaning of the language.
 

 Alas, § 815.18(6) has no legislative history, and apparently not a single Wisconsin court has construed its language. We are on our own. We cannot determine the meaning of “mower” by using the principle Erickson presses on us: that exemptions are “remedial” statutes and therefore to be “liberally” construed.
 
 Julius v. Druckrey,
 
 214 Wis. 643, 254 N.W. 358 (1934). This tells us the direction to move but does not help us figure out how far to go. “Liberality” may answer the question whether both a direct-drive mower and a friction-drive mower are statutory “mowers”; it does not answer any more complex problem. Finding the meaning of a statute is more like calculating a vector (with direction and length) than it is like identifying which way the underlying “values” or “purposes” point (which has direction alone). Cf.
 
 Walton v. United Consumers Club, Inc.,
 
 786 F.2d 303, 310-11 (7th Cir.1986);
 
 Mercado v. Calumet Federal Savings & Loan Ass’n,
 
 763 F.2d 269, 271 (7th Cir.1985). Too much “liberality” will undermine the statute as surely as too literal an interpretation would. The statute is designed to give farmers a fresh start. See generally Thomas H. Jackson,
 
 The Fresh-Start Policy in Bankruptcy Law,
 
 98 Harv.L.Rev. 1393 (1985). Any fresh-start policy must balance the gains from new beginnings against the costs of making it harder for lenders to collect. The more difficult collection becomes, the fewer assets are available to secure loans, the costlier is credit. Every expansion of the Wisconsin exemption statute makes loans riskier for banks and so raises the interest rate (or makes banks unwilling to lend at all to some people). This effect, which burdens the frugal and the spendthrift alike, can swamp the gains of fresh starts. Identifying the “liberal” function of exemptions does not assist us to determine when the increased cost of credit hurts farmers more than the fresh start helps them.
 

 We must turn to the statute’s structure and function. If the function of § 815.18(6) is to enable farmers to keep a minimal set of equipment to work the fields, then a haybine is a “mower”. It performs the mowing function of the mower, and its additional drying function used to be performed by rakes and other tools. The hay-bine and the mower have many features in common; the haybine is a close rather than a distant descendant of the mower. The Bank does not dispute the district court’s conclusion that the mower is obsolete, and that farmers use mower-conditioner combinations. Nothing in the case suggests that Erickson’s haybine is gold-plated or otherwise designed to evade the bankruptcy laws.
 

 No implement could be a mower without having a lot in common with the thing known as a mower in 1935, but the haybine meets this test. It contains the kind of mowing gear that used to be sold as a “mower”, plus a bar to bend the hay (so that the butt end flips up when the stalk is cut) and rollers to crush it. Perhaps the change in terminology is itself evidence that a haybine is “enough” separated from the old mower to be a “different” tool, but we hesitate to rely too much on that. The manufacturers’ invention of a new name, as opposed to using “enhanced mower” as a handle, may have been a marketing device rather than an attempt to describe the technical differences between the implements. And the alternative name (“mower-conditioner”) suggests the close link.
 

 To the extent there is doubt — and there is still substantial doubt, for the age of this statute prevents “literal” application to today’s farm equipment, even a piece of equipment galled a “mower” — we
 
 *1095
 
 accept the decision of the bankruptcy and district judges. The views here of judges skilled in the law of the state in which they sit are entitled to respect. E.g.,
 
 Small v. Sheba Investors, Inc.,
 
 811 F.2d 1163, 1164 (7th Cir.1987);
 
 Mosley v. Moran,
 
 798 F.2d 182, 187 (7th Cir.1986). The law has need of tie-breakers, and if this case be a tie (it comes close), the nod goes to the district court’s construction. This statute needs legislative attention; we cannot provide more than emergency care, and it is wise to avoid switching treatments so quickly.
 

 One final word. The Bank finds significance in Erickson’s possession of a “real” mower, worth $25. Since she has a mower, the Bank says, she must use the exemption for that machine rather than the ersatz mower. But the question whether a haybine is a mower cannot depend on what Erickson owns. The status of the haybine is a question of law. As the district court held, Erickson possesses two (statutory) mowers and may shield the more valuable. We do not suppose the Bank would be making this argument if Erickson’s mower were a valuable antique and her haybine a dilapidated mess. It does not matter which of her “mowers” is the more valuable.
 

 AFFIRMED