**CONTINENTAL CAN COMPANY, INC.,**
**Plaintiff–Appellant,**

v.

**CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT) PENSION FUND, Defendant–Appellee.**

No. 89–3759.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1990.

Decided Oct. 17, 1990.

Charles R. McKirdy, Matthew R. McArthur, Pope, Ballard, Shepard & Fowle, Chicago, Ill., for plaintiff-appellant.

Joseph M. Burns, Stephen B. Horwitz, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., for defendant-appellee.

Before FLAUM, EASTERBROOK and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Would a company whose customer paid 50.1% of the bill think it had received "substantially all" of the price? Not likely. Nonetheless, Continental Can Company insists that when a majority of a pension fund's assets come from firms engaged in the trucking business, contributing employers qualify for a treatment that is available only if "substantially all of the contributions required under the plan are made by employers primarily engaged in the long and short haul trucking industry", 29 U.S.C. § 1383(d)(2).

When Continental Can employed truck drivers to transport some of its goods in the Chicago area it made pension contributions to the Chicago Truck Drivers Pension Fund. Continental closed its trucking operation in July 1985 and withdrew from the Pension Fund, which demanded that it make good its share of the Fund's underfundedness—as it must, 29 U.S.C. §§ 1381, 1391, unless "substantially all" of the Fund's assets come from "employers primarily engaged in the long and short haul trucking industry". An arbitrator determined that 61.6% of the Fund's assets are attributable to such employers and that "substantially all" means 85%; he ordered Continental to make withdrawal payments exceeding $700,000. Continental asked the district court to set this award aside; the court enforced the award, 1989 U.S.Dist. LEXIS 13997 (N.D.Ill.), concluding (in line with several other courts) that less than 85% cannot be "substantially all". *Republic Industries, Inc. v. Teamsters Joint Council*, 718 F.2d 628, 643 n. 19 (4th Cir. 1983) (dictum); *Central States Pension Fund v. Bellmont Trucking Co.*, 610 F.Supp. 1505 (N.D.Ind.1985), affirmed on other grounds, 788 F.2d 428 (7th Cir.1986); *Peick v. PBGC*, 539 F.Supp. 1025, 1060 (N.D.Ill.1982), affirmed on other grounds, 724 F.2d 1247 (7th Cir.1983).

"Substantially all" sounds like "less than all, but not much less". Arbitrators and courts must convert this phrase to a percentage in order to make it work, which raises the question why Congress did not enact a percentage in the first place. It is as easy to write "a majority" or "two thirds" or "three quarters" or 85% or $e^{-0.162}$ as it is to write "substantially all"—and any of the former choices would have prevented disputes of this kind. Perhaps, however, "substantially all" is an attractive

standard because it enables Members of Congress to say different things to different interest groups. The genesis of § 1383(d)(2), which was § 4203(d)(2) of the Multiemployer Pension Plan Amendments Act of 1980, suggests something of this kind—although it is also consistent with the possibility that the sponsor pulled the wrong language out of his pocket.

On May 22, 1980, the House unanimously passed H.R. 3904, its bill to establish a system of withdrawal liability for underfunded pension plans. This bill lacked an exclusion for the trucking industry. Many of that industry's plans are chronically under-funded. The business also is characterized by frequent entry and exit (many firms are small). Exit does not necessarily threaten pension plans, because when one firm leaves another picks up the slack. Continental's departure had exactly this effect: although Continental closed its trucking operations, it still needs to move its goods. When the Senate's Labor and Human Resources and Finance Committees reported the Senate equivalent of H.R. 3904 to the floor on July 24, 1980, the bill had a special rule for the trucking business, in exactly the language that became § 4203(d)(2). The report accompanying the bill did not discuss the meaning of "substantially all".

The House accepted most of the Senate's amendments to H.R. 3904. Representative Thompson, the floor manager, commented on this particular change:

> The [Senate] bill also contains a special withdrawal liability rule for certain trucking industry plans where substantially all of the contributions are made by employers primarily engaged in the long and short haul trucking industry, the household goods moving industry or the public warehousing industry. The phrase "substantially all" appears in several provisions of the tax laws—including the industrial development bond and the private foundation rules—where the Internal Revenue Service has interpreted the phrase to mean at least 85 percent. It is our intent that, as used in this special trucking industry withdrawal liability rule, the substantially all require-

ment would only be satisfied where at least 85 percent of the contributions to the plan are made by employers who are primarily engaged in the specified industries.

126 Cong.Rec. 23040 (Aug. 25, 1980). The House passed the legislation unanimously the same day.

One day later the Senate also passed H.R. 3904, making a few changes in the House's latest version, amendments irrelevant to § 4203(d)(2)—which the House accepted verbatim. In a text sandwiched between two "speeches" marked by a • (indicating that the remarks were inserted after the debate rather than delivered on the floor) Sen. Durenberger explained why special treatment for the trucking industry is appropriate and added:

> [I]t should be observed that if the majority of the contributions to any pension plan are made by employers engaged in over the road (long) and short haul trucking ... this withdrawal liability procedure will apply to all employers who contribute to such a plan.

126 Cong.Rec. 23286–87 (Aug. 26, 1980). This remark, coming after both House and Senate had agreed to the language of § 4203(d)(2), is the first time anyone implied that "substantially all" means "majority".

■ Because the House was unwilling to accept all of the Senate's further amendments, the chambers held a conference. Section 4203(d)(2), language common to the two versions, was not mentioned in the Conference Committee's report. On September 26, 1980, President Carter signed the bill into law. That was not, however, the end of Senator Durenberger's efforts to explain his amendment. On November 19, 1980, the Senator inserted into the Congressional Record still another bulleted statement:

> Recently ... I found out that on the very day that I clarified the intent of this special withdrawal liability procedure for the trucking industry, Mr. Thompson told the House of Representatives that this special rule would only apply if at least

85 percent of the contributions to the plan were made by employers previously engaged in the specified industries. Mr. Thompson based his statement upon unrelated interpretations of the phrase "substantially all."

Since this amendment originated in the Senate without Mr. Thompson's participation, I am amazed that he would undertake an interpretation of the intent of the language.

My interpretation was based on information supplied to me as to the diversity of Teamster representation, and I am convinced that an 85–percent contribution requirement would emasculate the special withdrawal procedure.

Therefore, as a final clarification, I will reiterate that the withdrawal liability procedure will apply to any multiemployer pension plan in the trucking industry if the majority (50.1 percent) of contributions to the plan are made by employers who are primarily engaged in the long- and short-haul trucking industry, the household goods moving industry, or the public warehousing industry. •

126 Cong.Rec. 30203 (Nov. 19, 1980). Representative Thompson did not file a surrebuttal, perhaps thinking that the race is to the swift—for he had gotten his thoughts into the record before the House voted, while Senator Durenberger's two statements came after the Senate first adopted § 4203(d)(2), and the Senator's second statement came nearly two months after the bill became law.

Although Senator Durenberger was "amazed" that anyone would dare to interpret language he had not written, we do not view Representative Thompson's speech as an exercise in temerity. The Senate amended H.R. 3904 and wanted the House to accept its revisions. Members of the House were entitled to form their own understanding of the language before deciding whether to enact it. Words do not have meanings given by natural law. You don't have to be Ludwig Wittgenstein or Hans–Georg Gadamer to know that successful communication depends on meanings shared by interpretive communities. See *In re Erickson*, 815 F.2d 1090 (7th Cir.1987). Texts are addressed to readers, in this case initially to the Representatives. Authors' private meanings—meanings subjectively held but not communicated—do not influence the readers' beliefs. The Senate, and then the House, and the Senate once again, passed § 4203(d)(2) without knowing Senator Durenberger's belief that "substantially all" means 50.1%. At the time the President signed the bill, Rep. Thompson's specific statement of August 25 and Sen. Durenberger's vague one of August 26 were the only ones on paper. Representative Thompson's was in line with a frequent meaning of the phrase and must have supplied the meaning for the bulk of Members and the President, if the phrase was ever present to their minds. That is why statements after enactment do not count; the legislative history of a bill is valuable only to the extent it shows genesis and evolution, making "subsequent legislative history" an oxymoron. *Pierce v. Underwood*, 487 U.S. 552, 566–68, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974); *United States v. Marshall*, 908 F.2d 1312, 1318 (7th Cir.1990) (in banc); *Covalt v. Carey Canada Inc.*, 860 F.2d 1434, 1438–39 (7th Cir.1988).

Continental Can presses on us an extreme version of the belief that the "real" law lies in the "intent" of Congress, of which the words of the statute are just evidence. It is an extreme version because here the only intent is the author's; Continental Can wants us to disregard the intent of all the other Members of Congress and the President, even though their assent was necessary to put Sen. Durenberger's text into force. But we need not worry about whether the argument is modest or extreme, because its premise is wrong. The text of the statute, and not the private intent of the legislators, is the law. Only the text survived the complex process for proposing, amending, adopting, and obtaining the President's signature (or two-thirds of each house). It is easy to announce intents and hard to enact laws; the Constitution gives force only to what is enacted.

So the text is law and legislative intent a clue to the meaning of the text, rather than the text being a clue to legislative intent. *In re Sinclair,* 870 F.2d 1340 (7th Cir. 1989).

"Substantially all" may have a special meaning. Statutes contain words of art, whose meaning may appear strange to a lay reader. *Country Mutual Insurance Co. v. American Farm Bureau Federation,* 876 F.2d 599 (7th Cir.1989). Cf. *Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). "Substantially all" is one of those phrases with a special legal meaning. Congress uses it all the time in tax statutes, and the Internal Revenue Service decodes it as meaning 85%. Here are a few examples, well short of "substantially all": (1) 26 U.S.C. § 4071 imposes a tax on tires used for highway vehicles, unless the vehicles will be used "substantially all" of the time as school busses, 26 U.S.C. § 4221(e)(3); 26 C.F.R. § 48.4221–11(b)(3) provides that "substantially all" in § 4221(d)(7)(C) means 85% or more; (2) 26 U.S.C. § 4942(a) imposes a tax on a charitable foundation's undistributed income, but 26 U.S.C. § 4942(a)(1) and (j)(3)(A) exempt foundations that distribute "substantially all" of their income; 26 C.F.R. § 53.4942(b)–1(c) defines "substantially all" as "85 percent or more"; (3) 26 U.S.C. § 951(a) imposes a tax on Americans holding shares of certain foreign corporations but excludes from the corporations' income gains from the sale of commodities if "substantially all" of its business is as an active producer, § 954(c)(1)(C)(ii); 26 C.F.R. § 1.954–2T(f)(3)(iv) defines "substantially all" as "85 percent of the taxable income of the controlled foreign corporation." There are many more. *All* of the regulations we could find, not just substantially all, quantify this phrase as 85% or more. The only departure from 85% was on the high side. Rev.Proc. 77–37, § 3.01, 1977–2 C.B. 568, provides that the Internal Revenue Service will not issue letter rulings finding that corporate reorganizations satisfy the "substantially all" requirements in, e.g., 26 U.S.C. §§ 354(b)(1)(A) and 368(a), unless the transferred assets represent at least 90% of the fair market value of the net assets.

Because language is an exercise in shared understanding, one Senator's idiosyncratic meaning does not count. This was the point of the exchange between Alice and Humpty Dumpty. If everyone accepts a new meaning for a word, then the language has changed; if one speaker chooses a private meaning, we have babble rather than communication.

The question, then, is whether anyone other than Senator Durenberger used "substantially all" to signify 50.1% rather than 85%. Nothing in the debates suggests that they did. Representative Thompson's statement, the only one delivered on the floor in advance of passage, shows that he at least (and likely the House) used the phrase in the customary way. Senator Durenberger's two comments, inserted in the Congressional Record after the fact, could not have influenced anyone in the House and probably did not come to the attention of anyone in the Senate; anyway it was too late. Efforts of this kind to change the meaning of a text without bothering to change the text itself demonstrate why the use of legislative history has come under such vigorous attack, even by former Senators. E.g., *Electrical Workers v. NLRB,* 814 F.2d 697, 715–20 (D.C.Cir.1987) (Buckley, J., concurring). See also, e.g., *Iron Workers Pension Trust v. Allied Products Corp.,* 872 F.2d 208, 213 (7th Cir.1989). If Senator Durenberger wanted to see whether his colleagues would agree to an amendment exempting funds the majority of which came from the trucking industry, he had only to propose words such as "majority" or "50.1%" or "more than half" or "most". Instead he chose a formula with a known meaning and tipped into the Congressional Record a novel interpretation. Perhaps he believed that language expressly using a preponderance-of-the-assets standard would not have been enacted but he expected the federal courts to accept the legislative "history". Perhaps instead he meant to propose an amendment saying "majority" but slipped, and did the best he could later on to convey what he had meant to propose. Either way, what Congress

*enacted,* as opposed to what Sen. Durenberger wishes it had enacted, means 85%.

Continental Can has one last hope. Pointing to Sen. Durenberger's warning that an 85% threshold would "emasculate the special withdrawal procedure", it asks us to interpret the exception so that it has *some* effect. A study prepared by the Comptroller General bears out Sen. Durenberger's concern; it concludes that the 85% threshold

> has in effect negated the trucking rule at most trucking plans. Of the nine trucking plans in our sample, only one has determined that 85 percent of its contributing employers are in the trucking industry. This plan … is also relatively small, with fewer than 400 participants and 15 contributing employers.

*Assessment of Special Rules Exempting Employers Withdrawing from Multiemployer Pension Plans from Withdrawal Liability* 25 (1984). Congress does not legislate in vain, Continental Can reminds us, and it concludes that we must therefore choose a figure under 85%—preferably under 62%. To this the Fund replies that § 4203(d)(2) is a mere exception, that the multiemployer amendments are remedial legislation to be liberally construed, and that if we emasculate the exception we will be doing just what Congress wanted.

Debating whether to give liberal or stingy interpretations to exceptions is a bootless exercise. "Exceptions" are artifacts of language. If English contained a word (say, "pepti") meaning "multi-employer pension plans other than those to which firms in the trucking industry make 85% of the contributions", Congress could have said: "Any employer withdrawing from an under-funded pepti must make up its share of the shortfall." We would not see this as an "exception"; it would be a rule made intricate by the complex term "pepti". English does not contain many such comprehensive words, so statutes are written using rules and exceptions. Necessary adaptations to the language should not cause us to read rules broadly, or narrowly, or somewhere in between. We must instead ascertain the meaning of the full law as best we can, without a thumb on the scales.

Whether to shade the meaning of a term in order to achieve a particular effect (such as "more coverage of the exemption") also is not a question to which there is a general answer. Continental Can tells us that Congress' purpose was exclusion in the trucking industry and it wants more of this; the Fund tells us that Congress' purpose was imposition of withdrawal liability for underfunded plans, and it wants more of that. Of course Congress' purpose was both of these things, to a degree, and the question is: what degree? We cannot divine the balance between objectives by pointing to their existence. "[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States,* 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (emphasis in original); *Pension Benefit Guaranty Corp. v. LTV Corp.,* —— U.S. ——, 110 S.Ct. 2668, 2676, 110 L.Ed.2d 579 (1990). See also *Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 374, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986).

Congress had a choice: it could legislate a means, or it could legislate a result. It could say that firms participating in pension plans that have such-and-such attributes are exempt from withdrawal liability, or it could say, for example, that the 50% of the pension plans having the largest share of contributions from the trucking industry are exempt. It chose the former method. It (at least Sen. Durenberger and the interest groups for which he spoke) might have *anticipated* that the rule would exempt a large fraction of the industry, but anticipations and goals are not themselves law. See *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.,* 814 F.2d 358, 364–65 (7th Cir.1987). Statutory rules frequently differ from the goals animating their promot-

ers. *Prussner v. CIR*, 896 F.2d 218, 226 (7th Cir.1990) (in banc); *Railway Labor Executives' Ass'n v. ICC*, 894 F.2d 915, 918 (7th Cir.1990).

To see this, suppose that Congress had created an exclusion if "85% of the contributions required under the plan are made by employers primarily engaged in the long and short haul trucking industry", and the committee reports contained a prediction that this would exclude two-thirds of the industry. Now suppose the prediction is wrong, that only 10% of the plans in the trucking industry get more than 85% of their contributions from truckers, and a withdrawing firm convincingly demonstrates that the only way to exclude ⅔ of the plans is to reduce the threshold from 85% to 60%. Would it follow that a plan with 62% of its assets from the trucking business is exempt? Certainly not. Congress enacted the percentage and not the expectation. Disappointment with the results may supply a good reason for Congress to change the law; it does not provide a reason for a court to change the law.

■ From what we can see, the reason § 4203(d)(2) fails to cover many plans—the parties tell us that with an 85% threshold it would apply to *none* of the large plans—lies principally in another feature of the law. Contributions count toward the 85% (or the 50.1%) only if the employer is "primarily engaged" in the trucking business. Many firms employing truck drivers, and making large volumes of contributions to the multi-employer plans in the trucking industry, are not "primarily engaged" in transportation. Continental Can is an example. Its contributions to this plan were on behalf of truck drivers, but none counted toward the 85%. If § 4203(d)(2) applied when "substantially all of the contributions required under the plan are made [on behalf of employees] primarily engaged in the long and short haul trucking industry" (altered language in brackets), then the Chicago Truck Drivers Pension Fund would qualify for the exception, as would many other plans. All of this just goes to show, however, that if you choose different language, you get a different result. The language Congress chose excludes the Chicago Truck Drivers Pension Fund.

AFFIRMED.

FLAUM, Circuit Judge, concurring in the judgment.

I concur in the judgment of the majority. I write separately because of my reluctance to join what, with all due respect, I view as an unnecessary excursion into areas of legislative motive and functioning.

As the arbitrator and the district court found, the plain meaning of the term "substantially all" used in 29 U.S.C. § 1381 favors the Pension Fund. While what "substantially all" means in numerical terms may not be clear, what is clear is that it does not mean a bare majority. In light of the plain meaning of the statute as it relates to the question posed in this case, it is questionable whether examination of the legislative history of the statute is appropriate, much less enlightening. *See Davis v. Michigan Dept. of the Treasury*, 489 U.S. 803, 109 S.Ct. 1500, 1503 n. 3, 103 L.Ed.2d 891 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute.").

Moreover, any impact of the scant legislative history of § 1381 on the decision of this case is at best neutral. Continental's case is based in part on a particularly disfavored form of legislative "history," post-enactment statements. *See Pierce v. Underwood*, 487 U.S. at 566–68, 108 S.Ct. at 2550 (1988); *United States v. United Mine Workers*, 330 U.S. 258, 281–82, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947); *United States v. Marshall*, 908 F.2d 1312, 1318–19 (7th Cir.1990) (en banc). Even the pre-enactment statement of Senator Durenberger on which Continental relies conflicts with a contemporaneous statement made by Representative Thompson, to which we must accord equal weight.

Furthermore, the interpretation the arbitrator gave the term "substantially all" is consistent with the use of that term by the Internal Revenue Service in a variety of contexts. Turning to judicial interpretations, the view Continental propounds is inconsistent with the one taken by two

district courts in this Circuit. *Central States Pension Fund v. Bellmont Trucking Co.,* 610 F.Supp. 1505, 1510–11 (N.D. Ind.1985), *aff'd on other grounds,* 788 F.2d 428 (7th Cir.1986); *Peick v. PBGC,* 539 F.Supp. 1025, 1060–61 (N.D.Ill.1982), *aff'd on other grounds,* 724 F.2d 1247 (7th Cir. 1983). These reasons, taken together, suffice to dispose of this case.