**Cleremont L. COVALT and Ahnighita M. Covalt, Plaintiffs–Appellees,**

v.

**CAREY CANADA INC. and Union Carbide Corporation, Defendants–Appellants.**

No. 88–1828.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1988.

Decided Nov. 7, 1988.

Michael A. Bergin, Locke, Reynolds, Boyd & Weisell, Indianapolis, Ind., for defendants-appellants.

Stephen L. Williams, Mann Chaney Johnson Goodwin & Williams, Terre Haute, Ind., for plaintiffs-appellees.

---

Before WOOD, Jr. and EASTERBROOK, Circuit Judges, and GORDON, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

Indiana's statute of repose provides that any "product liability action" based on theories of negligence or strict liability "must be commenced within two (2) years after the cause of action accrues or within ten (10) years after the delivery of the product to the initial user or consumer", unless the claim accrues between eight and ten years after delivery, in which case the victim has two years to file suit. Ind.Code § 33–1–1.5–5. The ten-year period is an outside limit, *Dague v. Piper Aircraft Corp.*, 275 Ind. 520, 524–26, 418 N.E.2d 207, 210–11 (1981), so the time for commencing an action may expire before any injury has occurred. In one recent case the accident occurred twenty-nine years after the expiration of the ten-year period; we sustained the statute against a variety of constitutional attacks. *Bowman v. Niagara Machine & Tool Works, Inc.*, 832 F.2d 1052 (7th Cir.1987). See also *Pitts v. Unarco Industries, Inc.*, 712 F.2d 276, 279–81 (7th Cir.1983).

The prototypical "product liability action" arises out of the airplane that crashes or the punch press that mangles a hand. When the accident occurs more than ten years after delivery, the statute forbids tort litigation even if the victim files the suit the day after the accident. This interlocutory appeal under 28 U.S.C. § 1292(b) presents the question whether diseases should be treated differently from accidents for purposes of § 33–1–1.5–5. The court assumed in *Pitts* that there is no difference, and rejected due process and equal protection challenges to the application of the ten-year period to asbestosis that became manifest more than ten years after the last exposure. *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1219 (7th Cir.1984), reflects the same assumption. See also *Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir.1984) (North Carolina law).

Cleremont Covalt worked with asbestos at Proko Industries in Indiana between 1963 and 1971. He believes that Union Carbide Corp. and Carey Canada Inc. (a subsidiary of Celotex Corp.) furnished Proko with raw asbestos without properly warning Proko (or him) of its dangers. In 1986 physicians concluded that Covalt has asbestosis and lung cancer. He filed this suit promptly after learning of his afflictions and was met with a defense based on § 33–1–1.5–5. Despite our opinions in *Pitts* and *Yorger*, the district court denied the motion for summary judgment. 672 F.Supp. 367 (S.D.Ind.1987). The court certified the case for an interlocutory appeal, which we accepted.

Covalt offered two grounds on which to avoid the application of § 33–1–1.5–5: that in *Barnes v. A.H. Robins Co.*, 476 N.E.2d 84 (Ind.1985), the Supreme Court of Indiana created a disease exception to the ten-year period; and that the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–75 (CERCLA or the Superfund Act), preempts state periods of limitations for toxic substances, of which asbestos is one. 40 C.F.R. § 302.4. *Barnes* held that a tort claim based on a disease "accrues" for purposes of periods of limitations in Indiana only when the victim discovers (or in the exercise of reasonable diligence should have discovered) the ailment and its cause. *Walters v. Owens–Corning Fiberglass Corp.*, 781 F.2d 570 (7th Cir.1986), holds that this discovery rule applies to claims arising out of exposure to asbestos. The district court, combining *Barnes* with *Walters*, concluded that the two-year period within which to file a suit arising out of exposure to asbestos does not begin to run until the disease has been diagnosed. Adding the assumption that a claim cannot expire before it accrues, the district court held that Covalt's suit is timely. This made it unnecessary for the district court to discuss CERCLA—though Covalt relies on it in this court to defend the judgment in his favor, as is his right. *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426

---

[*] Hon. Myron L. Gordon, of the Eastern District of Wisconsin, sitting by designation.

U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976). We begin with this question of federal law.

■ Section 309(a)(1) of the Superfund Act, added by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. 99–499, provides:

In the case of any action brought under State law for personal injury ... which [is] caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1). The statute goes on to define the "federally required commencement date" as the "date the plaintiff knew (or reasonably should have known) that the personal injury ... [was] caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A). The parties agree that if this provision of SARA applies, then the suit is timely, for federal law replaces the date of delivery of the asbestos with the date on which the disease became manifest. Whether § 9658 applies depends on whether the asbestos to which Covalt was exposed between 1963 and 1971 was "released into the environment from a facility." As Covalt puts matters, his place of employment was a "facility", and releasing the asbestos within this facility is equivalent to releasing it "from" a facility. The defendants, by contrast, distinguish "within" and "from"; they maintain that the asbestos was not "released" at all, given another part of CERCLA, 42 U.S.C. § 9601(22), which defines "release" as:

any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons ...

Covalt was exposed in the workplace but does not have a remedy against his former employer; more, he says, the exception does not mention suppliers, so that injured employees always may sue parties other than their employers. This, he says, makes the exception irrelevant. By negative implication, Covalt proceeds, the inapplicability of the exception means that there must have been a release. One might reply that the exception may deal only with persons injured on the job as a result of wastes dumped by their employer's predecessor. Covalt's reading of § 9601(22)(A) could make the definition of "release" turn on the statute of limitations—that because Covalt did not sue (and anyway could not collect from) Proko, there was a "release", but if Covalt had still been employed and sued Proko there would have been no "release". Perhaps the exception deals with kinds of claims—for example, workplace injuries to employees that ordinarily are covered by workers' compensation programs—without depending on the employee's ability to collect in the given case. We shall not have to pursue this possibility, however, because we believe that the exception does not carry a negative implication. A place where work is being carried out is not the "environment" for purposes of the Superfund Act.

Section 309(a)(1) preempts state law only with respect to releases into the environment. The definition of "release" reiterates this limitation: only spilling, leaking, etc., "into the environment" is a "release". It is lexically possible to treat the "environment" as everything pertaining to the planet Earth, so that the instant a container of asbestos is opened it is released "into [the local portion of] the environment". Such a global treatment erases "released into the environment" as a limitation, however, by

ensuring that it is always satisfied. No substance, except perhaps an injected drug, harms anyone unless it was at least for an instant in an "environment". A reading of this sort trivializes statutory language. The text makes more sense if read to refer to more widespread releases that affect strangers: asbestos wafting out of Proko's plant and contaminating a nearby meadow, or shaken loose from insulation Proko installed in a school; asbestos left behind as a contaminant when Proko closes its plant; fluids leaching into the water supply from a plant, and so on.

Doubtless some of the language in the United States Code is meaningless. No institution can fill 20 linear feet of shelving with tiny type and commit no redundancies. Yet it is hard to believe that "released into the environment" is an empty phrase. The focus and structure of CERCLA itself show that it has force. Asbestos encountered at work is not a toxic waste, and the Superfund Act is about inactive hazardous waste sites. As the House Report on CERCLA put matters, the bill would

> provide for a national inventory of inactive hazardous waste sites and ... establish a program for appropriate environmental response action to protect public health and the environment from the dangers posed by such sites.... [A] major new source of environmental concern has surfaced: the tragic consequences of improperly, negligently, and recklessly [sic] hazardous waste disposal practices known as the "inactive hazardous waste site problem." ... It is the intent of the Committee ... to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites.

H.R.Rep. No. 96–1016, 96th Cong., 2d Sess. 17, 22 (1980), U.S.Code Cong. & Admin. News 1980, pp. 6119, 6124. The structure of CERCLA is what one would expect from the statement of purposes: the Act permits the Environmental Protection Agency to investigate sites it believes are contaminated with hazardous wastes and dangerous; it establishes a register of such places

and the Superfund to pay for cleaning them up; it permits the government to direct the former owners and operators of the sites to cleanse them, or to do so itself and collect the costs from former operators without regard to fault. It does not regulate emissions from existing sources (the subject of the Clean Air and Clean Water Acts) or the levels of toxic substances permitted at work (the subject of the Occupational Safety and Health Act).

SARA, the source of the text under consideration, does not change the focus or structure of CERCLA. The provision that became § 309(a)(1) originated in the House and had no parallel in the Senate bill. The House Report described CERCLA as establishing the "Superfund program to clean up abandoned hazardous waste sites", H.R. Rep. No. 99–253 Part 1, 99th Cong., 1st Sess. 54 (1985), and continues in that vein. Nothing in either the 1986 Amendments or their legislative history hints that EPA is to muscle in on the territory of the Department of Labor, which administers programs dealing with workplace safety. The portion of the House Report describing the new provision on statutes of limitations, *id.* at 105–06, repeated almost verbatim in the Conference Report, No. 99–962, 99th Cong., 2d Sess. 261 (1986), described the rationale for the amendment:

> State statutes of limitations define the time in which an injured party may bring a lawsuit seeking compensation for his injuries against the party alleged to be responsible for those injuries. These statutes usually run from two to four years, depending on the State. In the case of a long-latency disease, such as cancer, a party may be barred from bringing his lawsuit if the statute of limitations begins to run at the time of the first injury—rather than from the time when the party "discovers" that his injury was caused by the hazardous substance or pollutant or contaminant concerned.

The study done pursuant to § 301(e) of CERCLA by a distinguished panel of lawyers noted that certain State statutes deprive plaintiffs of their day in court.

The study noted that the problem centers around when the statute of limitations begins to run rather than the number of years it runs.

This section addresses the problem identified in the 301(e) study. While State law is generally applicable regarding actions brought under State law for personal injury, or property damage, which are caused or contributed to by exposure to any hazardous substances, or pollutant or contaminant, released into the environment from a facility, a Federally-required commencement date for the running of State statutes of limitations is established. This date is the date the plaintiff knew, or reaonably [sic] should have known, that the personal injury referred to above was caused or contributed to by the hazardous substance or pollutant or contaminant concerned. Special rules are noted for minors and incompetents.

The "§ 301(e) study" to which the Committee referred was conducted by twelve lawyers on the authority of 42 U.S.C. § 9651(e); their charge was to investigate the "adequacy of existing common law and statutory remedies in providing legal redress for harm to man and the environment caused by the release of hazardous substances into the environment", § 9651(e)(1): in other words, the original focus of CERCLA. Neither the study nor the reports on the 1986 Amendments suggests that the federal rule for the commencement of the period of limitations has a broader ambit that the Superfund Act itself—hazardous *wastes*. To the contrary, the study noted:

Instances when hazardous substances may be released in other than waste form—i.e., the application of pesticides regulated under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) —are expressly exempted from the enforcement provisions of the [Superfund] Act. Thus, the emphasis of this report, similar to the emphasis of CERCLA, is on remedying the adverse consequences of improper disposal, improper transportation, spills, and improperly maintained or closed disposal sites.

*Injuries and Damages from Hazardous Wastes—Analysis and Improvement of Legal Remedies: A Report to Congress in Compliance with Section 301(e) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (P.L. 96–510) by the 'Superfund Section 301(e) Study Group,'* in Senate Committee on Environment and Public Works, Committee Print No. 97–12 part 1, 97th Cong., 2d Sess. 26 (1982) (footnotes omitted).

The only snippets of legislative history that cut the other way are not legislative history at all. They appear in affidavits— one by a lobbyist and the other by a Member of the House of Representatives—filed in the district court. It is far from clear that such documents are admissible in evidence. See *Specht v. Jensen*, 853 F.2d 805 (10th Cir.1988) (en banc) (legal opinions are not admissible as expert testimony under Fed.R.Evid. 702). At all events, we pay these no heed. Legislative history is valuable only to the extent it reveals the background of the law and the assumptions shared by those who wrote and voted on the bills. It is a contemporaneous record that helps a court reconstruct the meaning of our always-ambiguous language. Statements and thoughts that not only did not but also could not have come to the attention of Congress at the time do not reveal the process of deliberations. By definition, words written after the vote and the President's signature were uninfluential in the process leading to the vote. That is why "subsequent legislative history" is not helpful as a guide to understanding a law. *Pierce v. Underwood*, — U.S. —, 108 S.Ct. 2541, 2550–51, 101 L.Ed.2d 490 (1988). Even the contemporaneous committee reports may be the work of those who could not get their thoughts into the text of the bill.

Subsequent writings may be nothing but wishful thinking, and unless they are uttered as part of the process of enacting a later law (and therefore show assumptions on which Congress as a whole acted at least once) they are of no account. *Quern v. Mandley*, 436 U.S. 725, 736 n. 10, 98 S.Ct. 2068, 2075 n. 10, 56 L.Ed.2d 658 (1978). Legislative history generated in

the course of litigation has even less utility, for it may be designed to mislead, to put an advocate's slant on things. The parol evidence rule does not apply to statutes (if it did, American courts would follow the British practice of disdaining even pre-enactment legislative history), but the concern for accuracy it embodies leads us to draw the line at statements made in Congress. The Covalts have not drawn to our attention any case in which a federal court relied on affidavits written for purposes of litigation as a source of reliable information about the meaning of a statute. California courts have not only admitted affidavits but also allowed legislators to testify about the meaning of statutes. E.g., *Friends of Mammoth v. Board of Supervisors*, 8 Cal. 3d 247, 258, 104 Cal.Rptr. 761, 768, 502 P.2d 1049, 1056 (1972); *Stewart v. Board of Medical Quality Assurance*, 80 Cal. App.3d 172, 143 Cal.Rptr. 641 (1978). They have been compellingly criticized, see Comment, *Statutory Interpretation in California: Individual Testimony as an Extrinsic Aid*, 15 U.S.F.L.Rev. 241 (1981), and we shall not import this isolated practice into federal court. Our declining to consider latter-day descriptions will induce Members of Congress to put their thoughts on record when they should—before the bill becomes law, when there is still time for other Members to deny the claims or amend the bills to avoid consequences they do not approve.

Doubtless one could say, as Covalt maintains, that applying § 309(a)(1) to substances encountered at work as part of ongoing operations would have deterrent and compensatory effects. The rule would make it more costly to have hazardous substances present at work; there would be correspondingly less on hand to escape from the plant or to leave behind as waste. Courts do not strive for "more" of all legislative objectives, however; laws have both directions and limits, and each must be scrupulously honored. "[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than

effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (emphasis in original). See also, e.g., *In re Erickson*, 815 F.2d 1090, 1094 (7th Cir.1987); *Mercado v. Calumet Federal Savings & Loan Ass'n*, 763 F.2d 269, 271–72 (7th Cir.1985). Giving § 309(a)(1) its broadest possible meaning not only preempts wide sweeps of state law—something we do not lightly attribute to Congress—but also thrusts CERCLA into the domain of other federal rules expressly dealing with employees' safety, another thing we do not lightly attribute to Congress.

■ The Superfund Act regulates waste dumps and other leakages "into the environment". The interior of a place of employment is not "the environment" for purposes of CERCLA—at least to the extent employees are the injured persons—and § 309(a)(1) therefore does not apply to Covalt's claim. Covalt could not have taken advantage of § 309(a)(1) had he developed asbestosis while on the job, and there is no reason why the statute should apply to him because he quit before becoming ill and sued Carey Canada instead of Proko. The Superfund Act does not preempt Indiana's statute of repose.

Thus we arrive at the question the district court decided: whether under Indiana law a person may file suit within two years after discovering that he has a disease (or other medical problem), notwithstanding that he made the discovery more than ten years after the last exposure to the substance that caused the problem. The district court relied entirely on *Barnes*, but both plaintiffs in that case filed suit more than two, but fewer than ten, years after their exposure to the product in question, the Dalkon Shield intrauterine device. The Supreme Court of Indiana did not create a disease exception to § 33–1–1.5–5; to the contrary, it went out of its way to "limit our finding ... to the precise factual pattern related", 476 N.E.2d at 87. The court did not cite or question *Pitts* or *Yorger*, which apply the ten-year period of repose

to diseases developing after the statutory period. It did not discuss the language of § 33–1–1.5–5, which does not support any difference between diseases and other kinds of injury.

Statutes of repose by their nature prevent the filing of claims that did not "accrue" before the bar; that is the holding of *Dague.* The punch press operator in *Bowman* whose claim expired 29 years before it accrued is not a less-deserving person than the asbestos worker whose disease became manifest 15 years after his last exposure to that product. In neither case was the plaintiff in any position to protect his rights before they vanished. In either case belated liability, on the basis of developments in press design or medical knowledge, may lead to the use of hindsight to judge long-gone deeds, which in turn creates unfortunate incentives to over-design products or replace them too soon and may interfere with the actuarial soundness of insurance markets. A legislature rationally could decide that these costs are too great to bear, especially when compared with a regime of compensation through the first-party health insurance that most persons carry. First-party insurance may be so much simpler and cheaper than third-party insurance through the legal system, for current effects of old causes, that a statute of repose may be equally desirable for accidents and diseases. It may be difficult or impossible to tell, for example, whether Covalt's lung cancer was caused by asbestos or something else, such as cigarettes. Most cases of lung cancer are unrelated to asbestos. An effort to attach cause to effect when medical science can give only probabilities based on population statistics may combine high cost with low accuracy.

Yet a state also rationally could conclude that there are important differences. The holding of *Barnes* is that diseases are sufficiently different from other sources of injury to call for a different rule defining the accrual of claims. Some language suggests that diseases always should be treated differently, see 476 N.E.2d at 85–86 (e.g., "The problem comes about when the act, seemingly innocent, causes changes so subtle and latent that they are not discoverable to the plaintiff until they manifest themselves many years later."). Other rationales for the discovery rule would apply equally to diseases and traumatic injuries such as airplane crashes, see 476 N.E.2d at 86: "The [discovery] rule is based on the reasoning that it is inconsistent with our system of jurisprudence to require a claimant to bring his cause of action in a limited period in which, even with due diligence, he could not be aware a cause of action exists."—a position that if taken literally is inconsistent with the application of statutes of repose to any case.

A federal court at this juncture ordinarily would survey other state cases to see what light they shed on the problem. There are, alas, none to survey. The parties informed us at oral argument that every asbestos case in Indiana has been filed in federal court. The federal judges in Indiana have disagreed about the application of § 33–1–1.5–5 in asbestos cases. Judge McKinney, formerly of the Indiana bench, held in this case that plaintiffs have two years from discovery notwithstanding § 33–1–1.5–5. Two other judges, both experienced Indiana lawyers before their appointment to the federal bench, have held that § 33–1–1.5–5 applies to asbestosis that becomes manifest more than ten years after the last exposure. *Knox v. AC & S, Inc.,* 690 F.Supp. 752 (S.D.Ind.1988) (Tinder, J.); *England v. Asbestos Corp.,* No. IP 81–163–C (S.D.Ind. Feb. 13, 1987) (Dillin, J.). Other federal judges have reserved decision on the same question pending our disposition of this case. We could not find parallel questions resolved by the courts of Indiana for diseases other than asbestosis.

A federal court is supposed to apply state law in diversity litigation, but circumstances have conspired to prevent the courts of Indiana from discussing the law pertinent to our problem, save as we have certified questions to them. Both *Dague* and *Barnes* were opinions answering questions certified from this court under Indiana R.App.P. 15(*O*). This is not a satisfactory position, but given litigants' apparent preference for federal court in as-

bestos cases, which (in Indiana) always come within the diversity jurisdiction, we think it appropriate to continue certifying questions to ensure that the law we apply is genuinely *state* law, and not a federal court's perception of what state judges ought to hold.

We therefore respectfully request the Supreme Court of Indiana to answer this dispositive question of state law:

Whether a plaintiff may bring suit within two years after discovering a disease and its cause, notwithstanding that the discovery was made more than ten years after the last exposure to the product that caused the disease.

The clerk of this court will transmit to the Supreme Court of Indiana the briefs, appendix, and record of this case.

QUESTION CERTIFIED.