**A.S.I., INC., a Kansas Corporation, and QMI Aerospace, Inc., a Kansas Corporation, Plaintiffs,**

**v.**

**James T. SANDERS, Twila Maxine. Sanders, Marshall J. Sanders, and Marcia Rene Larson, Defendants.**

**No. 92–1209–PFK.**

United States District Court, D. Kansas.

Oct. 29, 1993.

Jana C. Werner, Grace, Unruh & Pratt, Wichita, KS, for plaintiffs.

Ronald K. Badger, Wichita, KS, for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, Chief Judge.

Before the court are four motions for summary judgment filed by the defendant Sanders family, and one motion for summary judgment by plaintiffs A.S.I., Inc. and QMI Aerospace, Inc. in opposition to a counterclaim advanced by the Sanders. A.S.I. and QMI have brought the present action seeking recovery for damages and clean up costs relating to toxic contamination caused during the Sanders family's former ownership of QMI.

The court heard arguments relating to these motions on October 18, 1993. For the reasons stated herein, the court will hereby grant the various motions in whole or in part.

■ Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

■ In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Most of the motions before the court are based upon the same general set of underlying facts. On July 10, 1985, the Sanders family sold QMI Aerospace to plaintiff A.S.I.. In 1988, A.S.I.'s president Jim Regan also became the president of QMI. Prior to assuming the position of president at QMI, Regan had visited the QMI plant about once a month. He now began to visit the QMI plant weekly and began to familiarize himself with QMI's contamination problems.

On May 3, 1988, Regan received a letter from the Kansas Department of Health and Environment (KDHE) citing QMI for violation of state regulations, stating that the QMI plant had violated KDHE standards. The letter identified nine "items not in compliance with regulations concerning generators of hazardous waste," including

4. Continuous unpermitted surface discharge of water that has proven to be hazardous (Ep toxic for chrome) in the past. This is the southernmost of your two discharges on the east side. At a minimum, this is a violation of our water pollution control statutes.

The KDHE wrote again to QMI some three months later. In an August 19, 1988 letter, the KDHE stated that a follow-up inspection of the QMI plant was performed which revealed that the problems identified in the May 3 letter had not been corrected.

After receiving the May 3 letter, Regan had assigned the correction of the problems to Harry Clements, a consultant of QMI. Regan again spoke to Clements about resolving the contamination problems at QMI after receipt of the August 19 letter, to the effect, "Let's get this taken care of." In January of 1989, QMI hired Reiss & Goodness, a consulting engineering firm, to help with the company's pollution problems. At approximately the same time, Regan stepped down as president of QMI, and was replaced by Clements.

On January 30, 1989, the KDHE assessed a $10,000.00 penalty against QMI for soil contamination arising from the discharge of industrial waste water. The order assessing the penalty reviewed the history of the KDHE's investigations, noting that a 1986 inspection of QMI revealed the discharge of industrial waste water without a permit in violation of K.S.A. 65–165. The waste water had been tested by the KDHE and found to contain nearly 10 times the amount of chromium considered to be hazardous by federal regulations. The KDHE had notified QMI of these results by letter on May 1 and again on May 20, 1986. QMI was instructed to correct these problems by June 30, 1986.

The order then states that the KDHE had returned to QMI to conduct three investigations in late March and early April of 1988. These investigations revealed both the continued presence of three waste water discharges at QMI and chromium soil contamination. The KDHE notified QMI of these results by its letter of May 3, 1988. The order then states that a follow-up investigation was conducted on August 17, 1988, which found no changes at QMI. This investigation also revealed that, although QMI had no permit to store hazardous wastes, 56 drums of hazardous waste were in storage at the QMI plant. The order concluded that "the generation, accumulation, management and disposal of hazardous wastes by [QMI] has polluted the soil of the state, threatens to pollute the waters of the state and threatens to become a hazard to·the persons, property and public health."

After receiving the January 30, 1989 order assessing the administrative penalty, the management of A.S.I. and QMI began to explore their options for correcting the problem. In February, 1989, Clements prepared a summary of projects necessary to comply with the KDHE's order, and estimated that a full cleanup of the plant would cost $53,-000.00. Clements noted in this summary that "[a]ll items except current discharge of contaminated waste waters were caused in part or in total by activities prior to present ownership."

On February 22, 1989, the City of Wichita filed an amended petition in an action against A.S.I. and QMI, alleging that the defendants had committed fraud in obtaining industrial revenue bonds from the city in 1985 and 1986. The amended complaint specifically alleged that prior to the issuance of the 1985 bonds, the KDHE had investigated the well water at QMI and found low levels of VOC contamination, referencing a June 18, 1985 letter from the KDHE to QMI. In their subsequent answer, A.S.I. and QMI admitted receiving the June 18, 1985 letter from the KDHE.

On April 19, 1989, QMI's consultants, Reiss & Goodman, reported to the KDHE on a proposed plan to clean up the QMI site. In a letter to Clements on May 17, 1989, Reiss & Goodman informed QMI's president that the costs of cleaning up the QMI facility had increased 10-fold from previous estimates. According to this letter, "a total clean-up of all contaminated soil" at QMI would cost approximately $500,000.00.

The present action by A.S.I. and QMI against the Sanders family was filed May 1, 1992. The Sanders family has moved for summary judgment on the plaintiffs' claims of fraud and strict liability in tort, contending that the plaintiffs' failure to bring any action until well over two years after they learned of the contamination problems at QMI renders the present action time-barred.

## A. *Fraud*

The Sanders family has moved to dismiss the common-law fraud claims asserted by A.S.I. on the grounds that the action is time-barred under the two-year statute of limitations applicable to fraud actions. The present action was filed May 1, 1992. Under Kansas law, a cause of action for fraudulent misrepresentation accrues, and the statute of limitations begins to run, when the fraud was reasonably discoverable. *Wolf v. Brungardt,* 215 Kan. 272, 281–82, 524 P.2d 726 (1974).

In the present case, A.S.I. had notice of a potential claim for fraud by early 1989, three years before the present action was filed. By February of 1989, A.S.I. knew that KDHE had been investigating pollution problems at QMI since 1986, and that it had cited the company for violations. It also knew that the City of Wichita was suing A.S.I. and QMI over the 1985 and 1986 issuance of bonds, a suit which specifically included an allegation of fraud at the time the bonds were issued in 1985 and 1986.

Here, QMI and A.S.I. knew of pervasive pollution problems at the QMI site. Although the KDHE's 1988 letters to QMI concentrate on the waste water contamination problem, they also cite other potential violations. In its May 3 letter, the KDHE cited as a possible violation:

3. Illegal disposal of paint solvent. You were unable to show records (manifests) of past disposal of paint solvent, therefore, we can only conclude it has been disposed illegally. This is a violation of K.A.R. 28–31–4(d).

. . . .

6. There was much evidence of illegal dumping of paint residue to the east of your plant. Our analyses (attached) of these residues indicates it is hazardous (Ep toxic).

It may also be noted that KDHE communications to QMI were not limited to contemporaneous discharges of waste water. As indicated above, the KDHE cited the failure of QMI to maintain records demonstrated the proper "past disposal of paint solvents." The same letter also cited the practice of heat treated sals in an open dumpster, in violation of federal and state regulations. The letter states that "[t]his storage practice also suggests this waste may have been illegally disposed in the past."

Thus, by February of 1989 A.S.I. and QMI were aware that there were pervasive pollution problems at QMI. The evidence indicates that management of the companies knew these problems were not limited to the discharge of waste water, but also included the surface disposition of other hazardous substances, including paint solvents. Moreover, as shown by the Clements note written at about this time, QMI's management attributed these problems to the company's prior owners. By this time, then, A.S.I. and QMI had strong reasons to suspect that the representations made by the Sanders family in connection with the 1985 sale of QMI were not accurate.

Nor can the court accept the plaintiffs' suggestion that they were aware of only a minor pollution problem, and that they did not recognize the magnitude of the soil contamination until much later. First, it is not correct as a factual matter. The Reiss & Goodness report estimating soil cleanup costs of a half million dollars clearly indicated that the problems at QMI went beyond a minor difficulty relating to waste water discharge. This report was delivered to QMI on May 17, 1989, nearly three years before the present action was filed.

Moreover, the plaintiffs' argument would in any event fail under Kansas law. Even if the plaintiffs were not aware of the pervasive soil contamination problems at QMI, the repeated statements of the governing state regulatory body relating to waste water pollution problems had placed the plaintiffs on notice of the potential fraud under Kansas law.

In *Cooksey v. Jones,* 184 Kan. 300, 336 P.2d 422 (1959), the plaintiffs had purchased a cold storage locker plant, but quickly found that it was impossible to keep the plant cold and that some of the refrigeration equipment at the plant was defective. The plaintiffs purchased new equipment, but discovered some three years later that the plant also suffered from defective insulation. In up-

holding the trial court's dismissal of the plaintiffs' action, the court stated:

> It would seem that it would not require an expert to know that a locker plant could become warm because of poor insulation as well as from faulty machinery; that if defendant's alleged statements concerning the machinery were false, his statements concerning the insulation might also be false and that in view of the fact that the temperature of the plant could not be maintained, the insulation should be checked. Moreover, having discovered part of the alleged fraud in the matter of the machinery and the inability to maintain proper temperature, can plaintiffs say the statute of limitations did not begin to run because they apparently waived those representations? We think not.

184 Kan. at 302, 336 P.2d 422.

In *Cooksey*, the new owners of the plant knew both the ultimate damage (the locker plant would not stay cool) and one cause of this damage (faulty refrigeration equipment). Even when the equipment was changed, the locker plant still would not remain cool. Yet the owners of the plant waited three more years before they discovered that the plant's insulation was also faulty.

In the present case, the plaintiffs had notice by mid–1989 of the potential misrepresentations by the Sanders family in connection with the 1985 sale of QMI to A.S.I.. The court finds that the action for fraud first advanced by A.S.I. and QMI in 1992 is barred by the statute of limitations.

■ A different matter is presented by the plaintiffs' allegation that the Sanders family had authorized or acquiesced in the secret burial of drums of toxic waste on the QMI property in the mid–1970s. There is nothing in the record before the court which would indicate that the current management of A.S.I. and QMI knew anything of the burial of these drums until some time within two years of their filing the present action on May 1, 1992.

Compared to the waste water discharges and the surface disposal of hazardous chemicals, the intentional and surreptitious burial of drums of toxic waste represents misbehavior of a completely different kind. That is, even though the plaintiffs in 1989 may have had notice of the pervasive pollution problems at QMI, this information would not suggest to a reasonable person the additional existence of misbehavior of such a fundamentally different order represented by the alleged covert burial of drums of toxic waste. In the present case, on the other hand, the knowledge that QMI had a history of surface pollution problems does not necessarily or even probably suggest that there was also a history of the improper burial of wastes.

Accordingly, the court concludes that the plaintiffs' claims of fraud, to the extent that they are based upon the surface discharge of pollutants, is barred by their failure to bring the present action until three years after this date. The court also finds that A.S.I. and QMI are not time-barred from arguing fraud on the basis of the buried drums of toxic waste. The surreptitious burial of such drums represents a much different form of activity than the open discharge of pollutants on the surface of a property.

### B. *Strict Liability*

■ A.S.I. and QMI have also brought a state claim for strict liability based on the treatment of pollutants at QMI during the Sanders defendants' ownership of the company. The Sanders family has moved for summary judgment on the basis of the statute of limitations contained in K.S.A. 60–513(b). The court finds that much of the previous discussion relating to A.S.I. and QMI's fraud claim is also relevant here—that the management of A.S.I. and QMI knew or had reason to know by early 1989 of the history of surface pollution at QMI, and that their failure to bring this action for a further three years operates as a bar under K.S.A. 60–513.

On the other hand, the allegations relating to the buried drums did not arise until some later time. The defendant Sanders family argues, however, that the plaintiffs' claims relating to these drums are nonetheless barred under the 10–year statute of repose contained in K.S.A. 60–513(b). The Sanderses argue that the claim for damages based on the burial of the drums is barred since that burial occurred, if at all, either in 1974 or

1975, more than 10 years before the present action was brought.

■ The resolution of this issue depends upon a determination of when the state statute of repose begins to run: when the drums were buried, or when their burial was discovered or injured the plaintiffs. Resolving this issue requires an examination of a series of recent decisions by the Kansas Supreme Court, decisions which are not premised upon a consistent treatment of the issue. The ultimate conclusion, the court finds, based upon the most recent decisions of the Kansas Supreme Court, is that the 10–year period of repose should be deemed to begin to run from the time the drums were buried. The present action is still timely, however, as to defendants James and Twila Sanders because the statute of repose is preempted in this case by federal law.[1]

The first decision of the Kansas Supreme Court which directly and explicitly addressed the issue of when the statute of repose begins to run was *Tomlinson v. Celotex Corp.*, 244 Kan. 474, 770 P.2d 825 (1989). The main issue before the court in *Tomlinson* was whether the 10–year limitation contained in K.S.A. 60–513(b) could be constitutionally applied to bar the plaintiff's claim for asbestos exposure. However, the court was also required to resolve the secondary issue of when the 10–year period began to run. In addressing this issue, the court noted that there were two competing interpretations of the phrase "the time of the act giving rise to the cause of action" contained in K.S.A. 60–513(b). In *Colby v. E.R. Squibb & Sons*, 589 F.Supp. 714 (D.Kan.1984), this court had construed the phrase to mean the time of substantial injury to the plaintiff. In contrast, Judge O'Connor, in *Cowan v. Lederle Laboratories*, 604 F.Supp. 438 (D.Kan.1985), found that the phrase meant the time of the defendant's last wrongful act which subsequently caused or contributed to the plaintiff's injuries. *Tomlinson* concluded that *Cowan* yielded a more consistent and reasonable interpretation of the statute, and thus held that the phrase meant "the defendant's wrongful act, rather than the occurrence of a substantial injury." 244 Kan. at 481, 770 P.2d 825.

This interpretation remained the law of Kansas until 1991, when the supreme court overruled *Tomlinson* in *Gilger v. Lee Constr.*, 249 Kan. 307, 820 P.2d 390 (1991). This reversal took place without any attempt to address or analyze the language of K.S.A. 60–513(b). Instead, the *Gilger* court premised its decision upon a citation of precedent, stating that *Tomlinson*'s finding that the 10–year period begins to run from the time of the defendant's wrongful act was inconsistent with the view the court had earlier adopted in *Ruthrauff v. Kensinger*, 214 Kan. 185, 519 P.2d 661 (1974).[2] Thus, the court stated, the 10–year period "is not triggered until substantial injury occurs or is reasonably ascertainable, regardless of the antiquity of the wrongful act which caused the injury." 249 Kan. at 316, 820 P.2d 390.

In reality, the question of when the 10–year statute of repose begins to run was never in issue in *Ruthrauff*. In that case, the defendants constructed a residence in May, 1959. On September 17, 1970, the residence's furnace exploded, killing the plaintiff's decedent. The action against the builders was commenced on September 15, 1972. The court held that the 10–year period of repose was not applicable to the case. As the court noted, the then-current version [3] of

---

1. The action is barred against defendants Marshall J. Sanders and Marcia Rene Larson, since no CERCLA claims have been advanced against them, and hence there is no federal preemption as to the state statute of repose.

2. The *Gilger* court also cited two additional decisions, *Kinell v. N.W. Dible Co.*, 240 Kan. 439, 731 P.2d 245 (1987), and *Olson v. State Highway Com'n*, 235 Kan. 20, 679 P.2d 167 (1984). *Kinell* was a case involving a manifest injury, in which the court simply repeated its earlier ruling in *Ruthrauff*. In *Olson*, the only issue before the

court was the application of the *two*-year statute of limitation, not the 10–year period of repose. In neither case did the court address the triggering of the 10–year period of repose in latent injury cases.

3. The *Ruthrauff* court noted that if the legislature intended the 10–year provision to apply to cases involving manifest as well as latent injuries, it could have stated that "in no event shall an action be commenced more than ten years beyond the time of the act giving rise to the cause of action." 214 Kan. at 191. In 1987, the state

K.S.A. 60–513(b) provided for a two-year limitations period from the time the plaintiff's injury was reasonably discoverable, but that "in no event shall the period be extended more than ten (10) years beyond the time of the act giving rise to the cause of action." The court interpreted this to mean that the 10–year period served as a limitation only in cases of latent injuries—where the injury occurred but was not reasonably discoverable until sometime afterwards. Accordingly, the court concluded, the 10–year provision had no application in cases of manifest injuries— where the injury is by its nature immediately and inescapably apparent—such as an exploding furnace. *See Ruthrauff,* 214 Kan. at 191, 519 P.2d 661.

However, the subsequent treatment of the 10–year provision does not support the *Colby–Gilger* interpretation of "the act giving rise to the cause of action." In *Harding v. K.C. Wall Products,* 250 Kan. 655, 831 P.2d 958 (1992), the court addressed the constitutionality of the 1990 amendment to K.S.A. 60–3303, which revived latent disease actions which otherwise would have been barred by the 10–year limitation of K.S.A. 60–513(b).[4] The court first noted that the 10–year provision contained in K.S.A. 60–513(b) is properly understood as a statute of repose rather than a statute of limitation, and that claims barred thereunder cannot be revived.[5] 250 Kan. at 669, 831 P.2d 958. Nonetheless, the court ultimately concluded, on the basis of a logic not immediately apparent, that the revival effected in this instance was permissible nonetheless.

The important point here is the court's treatment of the time the 10–year period begins. In the course of its discussion of the distinction between a statute of limitation and a statute of repose, the court stated that the latter "limits the time during which a cause of action can arise and usually runs from an act of a defendant. It abolishes the cause of action after the passage of time *even*

though the cause of action may not have yet accrued.*" 250 Kan. at 668, 831 P.2d 958 (emphasis added). The court later repeated this idea, stating explicitly that K.S.A. 60–513(b) "bars the cause of action after the 10–year period even though the action may not have accrued." *Id.* at 669, 831 P.2d 958.

Implicit in this conclusion, of course, is that the 10–year period must have begun at some time earlier than a discoverable or substantial injury to the plaintiff—that is, the last act of the defendant. Thus, the *Harding* court, even while ostensibly adhering to what may be called the *Colby–Gilger* interpretation of when the 10–year statute begins to run, in fact rested its ultimate conclusion on an understanding which is antithetical to such an interpretation, implicitly adopting the *Cowan–Tomlinson* interpretation of the statute.

This shift away from *Gilger* was made even clearer in another case decided by the Kansas Supreme Court on the same day of its decision in *Harding.* In *Admire Bank & Trust v. City of Emporia,* 250 Kan. 688, 829 P.2d 578 (1992), the plaintiff sued the City of Emporia for damages to the plaintiff's property caused by the city's destruction of a neighboring building in 1970. The court held that the action was barred by the 10–year limitation contained in K.S.A. 60–513(b). According to the court, "a negligence action must be brought within 10 years *of the original wrongful act* or the action is barred." 250 Kan. at 698, 829 P.2d 578 (emphasis added).

There is unfortunately no discussion in the *Admire Bank* case as to when the various injuries (loss of lateral support and failing to seal the revealed wall against rainwater resulting in damage to the plaintiff's building) claimed by the plaintiff actually occurred. The single fact of importance in the decision was the date the defendant city demolished the neighboring building. Since the neighboring building was found to have been torn

---

legislature adopted this suggestion and so amended the statute.

**4.** This court previously had addressed the issue in *Waller v. Pittsburgh Corning Corp.,* 742 F.Supp. 581 (D.Kan.1990), *aff'd,* 946 F.2d 1514 (10th Cir.1991), finding that under Kansas law

claims previously barred by the 10–year period of repose could not be revived.

**5.** In reaching this conclusion the *Harding* court followed our distinction between the two types of statutes advanced in *Menne v. Celotex Corp.,* 722 F.Supp. 662 (D.Kan.1989).

down in 1970 and the plaintiff's claim was not brought until 1990, the action was held to be barred under 60–513(b).

The court again approached this issue in *Dobson v. Larkin Homes*, 251 Kan. 50, 832 P.2d 345 (1992). In that case, Larkin constructed a house in 1971 or 1972 which was eventually purchased by the Dobsons. In 1988, cracks began to appear in the house. The Dobsons filed suit against Larkin in 1990. The court held that the action was barred, since "Larkin's last possible act occurred in 1971 or 1972." 251 Kan. at 53, 832 P.2d 345.

The latest pronouncement on the issue came earlier this year in *Nida v. American Rock Crusher*, 253 Kan. 230, 855 P.2d 81 (1993). This decision was rendered this summer and is not cited in the briefs of the parties. *Nida* was an action for damage to real property caused by subsurface mining which had ceased some 30 years before the surface effects of the mining manifested themselves in an injury to the plaintiffs. Its recent decisions in *Harding, Admire Bank*, and *Dobson*, the court noted, all dealt with negligence or product liability claims. The court held that the action was essentially one sounding in intentional trespass, and therefore was not barred by the 10–year statute of repose in K.S.A. 60–513(b). *See* 253 Kan. at 238, 855 P.2d 81.

There are two separate issues at work in the case law relating to the statute of repose, issues which have not been consistently distinguished. First, is the 10–year provision even applicable to the plaintiff's claim? Second, if the 10–year provision is applicable, when did it begin to run? It is, in part, the failure to distinguish between these two issues which appears to have led to such confusion. *Ruthrauff* only addressed the first of these two considerations. Contrary to the inference later made in *Gilger*, the court in *Ruthrauff* never directly addressed the issue of when the 10–year period begins to run.

Indeed, to the extent any inference can be drawn from *Ruthrauff*, it has to be drawn in the opposite direction from that made in *Gilger*. If the *Ruthrauff* court understood the phrase "the act giving rise to the cause of action" as meaning the time of substantial injury to the plaintiff, as *Gilger* assumes, the considered and lengthy analysis the *Ruthrauff* court performed on the language of K.S.A. 60–513(b) was pointless dicta. The decedent's furnace exploded in 1970 and her estate brought suit within two years of that date. If the 10–year period of repose was understood to begin to run only from the date of substantial injury, then the 10–year limitations period would never have been applicable in the first place. The only reason the *Ruthrauff* court felt compelled to conduct such a searching inquiry into the applicability of the 10–year provision was the obvious though implicit assumption that the 10–year period had run, and would bar the plaintiff's claim if the provision were found to be applicable. The most recent decisions of the court compel the conclusion that the court effectively, if not openly, has abandoned the view that the "act giving rise to the cause of action" means the time of substantial injury, at least in the case of actions which are not premised on intentionally tortious conduct. The contrary view, implicit in *Ruthrauff* and explicit in *Tomlinson*, accords a plain reading of the language of the "act giving rise to the cause of action," and one consistent with the recent decisions of the court. But the rule is one of extreme harshness and dubious fairness. This was recognized by the court in *Tomlinson*, and by Judge Theis in *Bolin v. Cessna Aircraft*, 759 F.Supp. 692, 700 (D.Kan.1991). The harshness of the rule was also recognized by this court in *Harding v. Proko Industr.*, 765 F.Supp. 1053, 1055 (D.Kan.1991). In *Gilger*, the court was able to evade the harsh effects of its earlier decision in *Tomlinson* by identifying a supposed conflict between that case and *Ruthrauff*. With the creation of subsequent legislation which has removed claims for latent disease from the bar of the statue of repose, the court has effectively returned to the *Ruthrauff–Tomlinson* understanding of the statute, while, either by art or otherwise, failing to make explicit this disavowal of *Gilger*. To be consistent with the plain, common-sense reading of the language of K.S.A. 60–513(b), and with the recent decisions of the state supreme court, this court must hold

it starts to run from the time of the defendant's wrongful act, burying the drums.

■ However, while state law would thus otherwise render the result that the 10–year statute of repose began to run in 1974 or 1975, the present action nonetheless shall not be barred as to defendants James and Twila Sanders since the state statute of repose is preempted by federal law. Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), state law creating limitations periods which begin to run earlier than under federal law are preempted.

In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1). The statute further specifies that the "federally required commencement date" is defined as the date the plaintiff knew or reasonably should have known that his damages were caused or contributed to by a particular pollutant. 42 U.S.C. § 9658(b)(4).

Applied here, the federal statute would preempt the application of the 10–year statute of repose, since that statute does not allow for discovery of the injury. The defendants argue in their reply that CERCLA preemption of the statute of repose should not be found, premising their argument on the characterization of such statutes of repose as "substantive" as opposed to "procedural" in nature.

There are several cases which have found no preemption in the case of state statutes of repose, but in all of these cases this conclusion was reached after a finding that the particular type of action before the court was not covered by CERCLA, and hence, the statute's preemption provision was inapplicable. *See First United Methodist Church v. United States Gypsum*, 882 F.2d 862 (4th Cir.1989), *cert. denied*, 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990) (CERCLA not applicable in action to recover removal costs of asbestos from interior of building); *Covalt v. Carey Canada, Inc.*, 860 F.2d 1434 (7th Cir.1988) (CERCLA not applicable because plaintiff's exposure to asbestos in the workplace not the result of a release into the environment); *Knox v. AC & S, Inc.*, 690 F.Supp. 752 (S.D.Ind.1988); *Electric Power Bd. v. Westinghouse Electric*, 716 F.Supp. 1069 (E.D.Tenn.1988), *aff'd*, 879 F.2d 1368 (6th Cir.1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 724, 107 L.Ed.2d 743 (1990).

There is no suggestion in any of the reported cases that the mere fact that a statute of repose might be deemed "substantive" law in a certain context immunizes the statute from preemption under CERCLA. To the contrary, these cases all resolve the issue by determining the separate issue of whether the action could be properly brought under CERCLA. The cases treat state statutes of limitations and statutes of repose identically. There are no cases holding that § 9658 has no preemptive effect in cases of "substantive" statutes of repose.

On the other hand, Judge Theis ruled explicitly in *Bolin v. Cessna Aircraft*, 759 F.Supp. 692 (D.Kan.1991), that § 9658 preempts state legislation such as K.S.A. 60–513(b) to the extent that such legislation creates limitations periods which commence other than upon the time of discovery of an injury from a given pollutant.

The court will allow A.S.I. and QMI to proceed with their fraud claims premised on the alleged burial of the drums, and their strict liability claims against James and Twila Sanders based on the same actions during their ownership of QMI. As for discharge of waste water and the surface disposal of solvents and other hazardous chemicals, the court concludes that the uncontradicted evidence establishes that beyond any reasonable doubt there was repeated and substantial information relating to such practices available to plaintiffs A.S.I. and QMI by early

1989. Their failure to bring the present action for over three years afterwards means that claims arising from such activities are time-barred.

### C. *Indemnity*

 The next motion for summary judgment deals with count VII of the amended complaint of A.S.I. and QMI. In this count, A.S.I. and QMI make a claim against the Sanders family for indemnification of costs in dealing with contamination at QMI under an agreement entered into between the parties on July 17, 1985, just after the sale of QMI from the Sanders family to A.S.I.. The Sanders defendants have now moved for summary judgment, contending that the claim for indemnification is barred by the Mutual Release and Settlement Agreement signed by the parties on February 10, 1986. A.S.I. and QMI argue that the 1986 release has nothing to do with their current claim for indemnification.

The court will grant the motion of the Sanders family on this issue. It is true, as A.S.I. and QMI point out, that the release agreement does state in its whereas clauses that A.S.I. and QMI had in late 1985 and early 1986 advanced some claims against the Sanders family based on the Stock Purchase Agreement entered into on July 17,. 1985. But it does not follow, as A.S.I. and QMI argue further, that the release should be interpreted to relate only to those existing claims and not to subsequent claims for other matters (such as the present action for indemnification arising from the cleanup costs of pollution). The operative portion of the release agreement is broad and unequivocal, and is not qualified in any relevant way:

> Quality and A.S.I. do hereby release Sanders and each of them from *all claims, causes of action, and liabilities of any nature now or hereafter arising* from representations and warranties relating to the financial condition and assets of Quality under the Stock Purchase Agreement and the Indemnity Agreement except any claims arising out of a breach of the warranty with respect to taxes.

(Mutual Release & Settlement Agreement, p. 2; emphasis added).

By the plain terms of the release, A.S.I. and QMI released the Sanderses for all claims arising under the indemnity agreement. A.S.I. and QMI argue that public policy prohibits a general release from affecting rights to bring an action for indemnification of pollution cleanup costs. But the cases cited by A.S.I. and QMI merely establish that a general release will not provide immunity to a subsequent CERCLA action for contribution. *See Mobay Corp. v. Allied-Signal, Inc.,* 761 F.Supp. 345 (D.N.J.1991).

Count VII of the amended complaint does not state a claim under CERCLA but reflects instead a claim for indemnification under state law. And there is nothing under state law which would render the release to be ineffective as to such indemnification claims. Accordingly, the court will grant the Sanders defendants' motion as to count VII.

### D. *Pendent State Claims*

The Sanders defendants also moves to dismiss all the various state claims advanced by A.S.I. and QMI. They argue first that pendent claim jurisdiction is not permissible under CERCLA, and in any event no pendent jurisdiction could be exercised over two of the defendants (Marshall Sanders and Marcia Larson) because these defendants have not been named in that portion of the amended complaint asserting claims under CERCLA. However, even if pendent claim jurisdiction is unavailable, the court believes that it possesses diversity jurisdiction to hear the plaintiffs' pendent claims, and further concludes that the retention of such claims will not materially impair the ability of the court to expeditiously address the CERCLA issues presented herein.

The Sanderses next argue that A.S.I. and QMI are not entitled under CERCLA to obtain response costs for cleanup operations on property not owned by QMI. However, these costs apparently stem from the cleanup of neighboring property owned by the City of Wichita, and appear to have been undertaken not as a gratuity by A.S.I. and QMI but as something they were compelled to do as the source of the pollution. Accordingly, the court will deny the Sanders' motion on this point.

Next, the Sanders defendants attack count V of the amended complaint, which sets forth a claim for "intentional discharge of waste," contending that there is no such claim recognized under state law. In response, A.S.I. and QMI support their claim by citing the decision in *Allied Corp. v. Frola,* 730 F.Supp. 626, 631 (D.N.J.1990). But this case merely dealt with the timeliness of such a claim which had been brought under New Jersey law. There is no indication that Kansas recognizes such a claim. The court will grant summary judgment as to count V of the amended complaint.

Finally, defendants Sanders seek summary judgment on count VIII of the amended complaint, which contains a general collection of claims for common law indemnity, contribution, and restitution. In response, plaintiffs A.S.I. and QMI fail to come forward with any substantial authority for the application of these particular claims. The court will grant summary judgment as to count VIII of the amended complaint.

### E. *Promissory Note*

■ The final issue herein arises from the Sanders defendants' counterclaim for some $270,000.00, which reflects the amount due on a promissory note issued in connection with the sale of QMI. A.S.I. and QMI have moved for summary judgment on the issue, contending that the Sanderses are not entitled to the entire amount due on the promissory note.

During 1988 when QMI was experiencing financial difficulties, it attempted to settle some of its claims, including the Sanders note. Under an agreement with the Sanders family, the note would be released in exchange for an immediate payment of $30,-000.00 and a subsequent payment of an additional $5,000.00 if QMI remained in business after several years. The $30,000.00 payment was made, but QMI subsequently failed to make final payment when it was demanded by the Sanderses.

The court will grant the motion for summary judgment. At most the Sanders defendants are entitled to the $5,000.00 additional payment, not the full value of the promissory note. When the $30,000.00 payment was delivered, it was stated that it was being made in settlement of the disputed promissory note. There is nothing to show why, assuming QMI breached the settlement agreement by failing to pay the $5,000.00, the Sanders family should be entitled to rescind the settlement and recover on the original note. That is, said defendants have failed to demonstrate that the payment of this additional sum was a material breach of the settlement which would justify recision. The court finds that the Sanders family's remedy is limited to payment of the $5,000.00.

IT IS ACCORDINGLY ORDERED this 28 day of October, 1993, that the motions for summary judgment filed by defendants Sanders (Dkt. Nos. 84, 110 & 112) are granted in part and denied in part; the motion for summary judgment of plaintiffs A.S.I. and QMI (Dkt. No. 96), and the motion for summary judgment of defendants Sanders (Dkt. No. 108) are hereby granted in full.